UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| PAVEL BUTORIN, Derivatively on Behalf of Nominal Defendant KBR, INC., | § § § § | Civil Action No. 4:14-cv-1471 |
| Plaintiff, | § § | |
| v. | § § | |
| W. FRANK BLOUNT, LOREN K. CARROLL, JEFFREY E. CURTISS, LINDA Z. COOK, LESTER L. LYLES, JACK B. MOORE, RICHARD J. SLATER, JOHN R. HUFF, and WILLIAM P. UTT, | § § § § § § | |
| Defendants, | § § | |
| and | § § | |
| KBR, INC., | § § | |
| Nominal Defendant. | § | |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR
BREACH OF FIDUCIARY DUTY AND ABUSE OF CONTROL**

Plaintiff Pavel Butorin ("Plaintiff"), by and through his undersigned attorneys, brings this derivative complaint for the benefit of nominal defendant, KBR, Inc. ("KBR" or the "Company"), against certain current and former members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties and abuse of control. All facts relating to Plaintiff and his own acts are pled on personal knowledge, while other facts are pled upon information and belief.

**NATURE AND SUMMARY OF THE ACTION**

1.     KBR is a global engineering, construction and services company. Due to the nature of its business, the ability accurately account for the costs of project contracts is critical to

KBR's financial reporting and the Company is particularly dependent on maintaining its internal financial controls.

2.     On May 5, 2014, KBR disclosed that its financial statements for the 2013 fiscal year should not be relied on and would be restated.  The Company disclosed that due to errors in the estimates of costs to complete seven contracts in KBR's Services segment, the Company would be required to take a pre-tax charge of more than $150 million and the reversal of over $20 million in previously recognized profits, with an additional negative cash flow impact of up to over $40 million.  The Company also disclosed an overstatement of an additional $9 million in revenue and an understatement of income tax provision of approximately $6.5 million.  KBR will be forced to restate its Form 10-K for the 2013 fiscal year and has delayed filing its Form 10-Q for the first quarter of 2014.

3.     The amounts to be restated are material: although KBR's annual revenues are in the billions, KBR's reported operating income (profits realized after operating expenses) for 2012 was only approximately $300 million and only $471 million in 2013.  The $150 million charge and additional over $40 million negative cash impact are equivalent to over 40% of the Company's $471 million operating income.

4.     Throughout the 2013 fiscal year, the Director Defendants were repeatedly presented with facts showing that the Company's internal controls were inadequate and the Company's financial statements repeatedly and materially underestimated costs under various contracts.  For example, when KBR's 2012 operating income came in at less than half of the Company's 2011 operating income, under-estimated contract costs were listed as a significant factor.  Then, after the Company filed its 2012 Form 10-K, the SEC requested it disclose additional information regarding material revisions to contract costs.  According to the 2013

Form 10-K, KBR's Services segment's operating income declined from the previous year due in large part to $62 million in charges related to the underestimation of contract costs.

5.      Unfortunately for KBR and its shareholders, this was not the first time in recent years the Company's internal controls over financial reporting failed to catastrophic effect.  In 2009, KBR was criminally charged by the U.S. Department of Justice ("DOJ") and was the target of an enforcement action filed in this Court by the U.S. Securities and Exchange Commission ("SEC") in connection with violations of the Foreign Corrupt Practices Act ("FCPA").  The allegations concerned a hundred-million dollar scheme – involving KBR's then-CEO – to bribe Nigerian government officials to obtain access to a lucrative natural gas field in Nigeria.  In order to conceal the massive bribes, the Company made numerous false accounting entries.  To resolve the DOJ and SEC actions, the Company pled guilty to four criminal counts and consented to the entry of a final judgment in the SEC action.  Consequences included joint and several liability for fines over $550 million and KBR's consent to a permanent injunction against deficient internal controls and improper accounting.

6.      Plaintiff has not made a demand on the Director Defendants prior to commencing this action because doing so would be futile.  KBR's public filings have repeatedly disclosed that the entire Board, and the Audit Committee, have higher-than-typical oversight duties in connection with KBR's financial risks and in particular, with regard to how the Company accounts for costs under its contracts.  Defendants Blount, Carroll, Curtiss, Lyles, and Slater, five of the seven Board members, were on the Board in 2009 when the Company entered the FCPA guilty plea and consented to the final judgment in the SEC enforcement action due in part to the Company's deficient internal controls.  These five defendants also face a substantial likelihood of liability because they declined to ensure that the Company's internal controls functioned

properly notwithstanding the SEC's permanent injunction.  This could not have been in good faith.

7.     Assuming the Board and Audit Committee functioned as stated in KBR's public filings, the Director Defendants were fully informed regarding the Company's deficient controls and its repeated over-estimation of contract costs.  Yet, they declined to take action to improve the controls and ensure accurate financial statements.  Now, the Company has been seriously harmed.  As a result, the entire KBR Board and the four-member Audit Committee face substantial likelihoods of liability because they knew the Company's controls were deficient and declined to take action until it was too late.

8.     As a result, the KBR Board breached its fiduciary duties by permitting the Company's internal controls to be inadequate despite being informed that they were not properly functioning.  For this reason, demand on the KBR Board was futile and therefore excused.

## JURISDICTION AND VENUE

9.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs.  Plaintiff is a citizen of New York, and no defendant is a citizen of that state.  This Court has supplemental jurisdiction over all state law claims pursuant to 28 U.S.C. § 1367(a).

10.    Venue is proper in this Court because KBR maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the Director Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

**A.    Plaintiff**

11.    Plaintiff is a shareholder of KBR and continues to be.  Plaintiff is a citizen of New York.

**B.    Defendants**

12.    Nominal defendant KBR is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 601 Jefferson Street, Houston, Texas 77002.  According to its public filings, KBR is a global engineering, construction, and services company. KBR's common stock trades on the New York Stock Exchange under the symbol "KBR."

13.    Loren K. Carroll ("Carroll") is the Chairman of the Board and has served as a director of KBR since 2007.  Defendant Carroll is the Chairman of the Nominating and Corporate governance Committee and a member of the Compensation Committee.  Upon information and belief, defendant Carroll is a citizen of California.

14.    W. Frank Blount ("Blount") has served as a director of KBR since 2007. Defendant Blount is a member of the Nominating and Corporate Governance Committee and the Audit Committee.  Upon information and belief, defendant Blount is a citizen of North Carolina.

15.    Jeffrey E. Curtiss ("Curtiss") has served as a director of KBR since 2006.  He is the Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee.  Upon information and belief, defendant Curtiss is a citizen of Texas.

16.    Linda Z. Cook ("Cook") has served as a director of KBR since 2011.  Cook is a member of the Corporate Social Responsibility Committee and the Compensation Committee. Upon information and belief, defendant Cook is a citizen of Texas.

17.     Lester L. Lyles ("Lyles") has served as a director of KBR since 2007.  Lyles is a member of the Corporate Social Responsibility Committee and the Audit Committee.  Upon information and belief, defendant Curtiss is a citizen of Virginia.

18.     Jack B. Moore ("Moore") has served as a director of KBR since 2012.  Moore is a member of the Audit Committee and the Corporate Social Responsibility Committee.  Upon information and belief, defendant Moore is a citizen of Texas.

19.     Richard J. Slater ("Slater") has served as a director since 2006.  Slater is the Chairman of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.  Upon information and belief, defendant Slater is a citizen of California.

20.     John R. Huff ("Huff") served as a director of KBR from 2007 until the annual meeting of shareholders in May 2014.  Upon information and belief, defendant Huff is a citizen of Texas.

21.     William P. Utt ("Utt") is the Chairman and Chief Executive Officer of KBR and has been a director since 2007 but did not stand for reelection at the annual meeting of shareholders in May 2014.  Defendant Utt plans to step down in June 2014.  Upon information and belief, defendant Utt is a citizen of Texas.

22.     The defendants referenced in ¶¶ 13-19 are the current members of KBR's Board and are collectively referred to herein as the "Director Defendants."

## DEFENDANTS' DUTIES

23.     By reason of their positions as officers, directors, and/or fiduciaries of KBR and because of their ability to control the business and corporate affairs of KBR, at all relevant times defendants owed KBR and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage KBR in a fair, just,

honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of KBR and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to KBR and its shareholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

24.    Defendants, because of their positions of control and authority as directors and/or officers of KBR, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with KBR, each of the defendants had knowledge of material non-public information regarding the Company.

25.    To discharge their duties, the officers and directors of KBR were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties, the officers and directors of KBR were required to, among other things:

   a.   Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b.   Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;

   c.   Exercise good faith to ensure that the Company's communications with the public and with shareholders are made with due candor in a timely and complete fashion; and

     d.      When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence

26.     According to its charter,  the Audit Committee of KBR's Board is to provide oversight of:

(1) the integrity of the financial statements of the Corporation, (2) the compliance by the Corporation with legal and regulatory requirements, (3) the independence, qualifications and performance of the Corporation's independent auditors and (4) the performance of the Corporation's internal audit function.

## SUBSTANTIVE ALLEGATIONS

The 2012 Form 10-K

27.     On February 20, 2013, KBR filed with the SEC its Form 10-K for its 2012 fiscal year (the "2012 10-K").  In the 2012 Form 10-K, KBR described its four business segments: (a) Hydrocarbons; (b) Infrastructure, Government & Power ("IGP"); (c) Services; and (d) "Other."   The Hydrocarbons business provides services from prefeasibility studies to construction and is involved in constructing liquefied natural gas plants in several countries.  The IGP business provides services to industrial commercial, defense, and governmental agencies including base operations, facilities management, and border security to governmental agencies worldwide.   The Services segment provides direct hire construction and construction management, fabrication, operations/maintenance, commissioning/startup, and turnaround services worldwide.   The Services segment is organized around four product lines, U.S. Construction, Industrial Services, Building Group and Canada Operations.   The Canada Operations product line serves oil and gas customers, among others.  The "Other" segment is the Ventures business unity and other operations.

28.     The 2012 10-K disclosed that KBR's 2012 consolidated operating income was $299 million, compared to $587 in 2011.  This decrease was due in significant part to an $82

million decline in operating income from the Services segment.   In particular, "[o]perating income from Services declined due to increased estimated costs to complete several U.S. construction fixed-price projects[.]"   In 2012, the Company's total revenue was approximately $7.9 billion, of which $1.6 billion was derived from the Services segment.   The Company's 2012 Services revenue increase by $43 million 2012 as compared to 2011.   The Form 10-K stated "[t]his increase is primarily driven by increases of $167 million our Canada product line and $121 million in our U.S. Construction product line."   The increased activity in Canada was primarily related to construction services for gas plants in Northern British Columbia and fabrication modules for oil sands projects.

29.     The 2012 10-K also contained a section titled "Critical Accounting Policies" which, among other things, contained a subheading describing KBR's accounting for "Engineering and Construction Contracts."   This subheading stated "[a]t least quarterly, significant projects are reviewed in detail by senior management" specifically in connection with cost estimates.

<u>The 2013 Fiscal Year</u>

30.     On April 1, 2014, the SEC sent a comment letter to the Company in connection with the 2012 10-K requesting additional information regarding a wide variety of financial metrics.   The letter stated in part: "Please expand your discussion to disclose the effects of any material revisions in contract estimates" and "[p]lease disclose the amount of pre-contract costs deferred, if material."

31.     On April 5, 2013, the Company filed its definitive proxy statement in advance of the annual meeting of shareholders to be held May 16, 2013.   The proxy statement solicited shareholder votes for the reelection of defendants Blount, Carroll, Cook, Curtiss, Moore, and Utt.

The proxy statement stated that each of KBR's incumbent directors "attended seventy-five percent or more of the aggregate of all meetings of the Board and of committees on which they served during the periods that they served during 2012."   According to the proxy statement, defendant Carroll, as Lead Director, worked closely with defendant Utt "and the Board on risk oversight and governance matters."   The proxy statement stated "KBR's Corporate Governance Guidelines provide for the Lead Director to perform a strong role in the leadership of the Board." As of April 2013, the members of the Audit Committee were defendants Blount, Lyles, and Moore.  Curtiss was the Chairman.  The proxy statement also stated:

> KBR's Board of Directors considers risk oversight to be an integral part of its role, and *discussions regarding risks faced by the company are part of its meetings and deliberations throughout the year*.  Furthermore, *at least twice each year, the entire Board receives a report from management regarding significant strategic, operational, financial, and hazard risks determined by management to have a potential significant impact on the company as a whole*.  The risk report involves both current and emerging risks and is the culmination of a process involving input from all business units and executive leadership.  The risk report includes specific strategic, operational, financial and hazard risks, the perceived trend for each of those specific risks — whether increasing, decreasing or stable — and the measures being taken to monitor and mitigate those risks.

> In addition to the enterprise risk management process described above, the Board of Directors also engages in *risk oversight in the area of project revenues*.  At each meeting, the Board reviews aggregated KBR project revenues *measured by type of contract* — fixed-price or reimbursable — by country, client and project backlog. In this manner, the Board is informed of the overall risk profile of KBR's project revenues.  *The Board also engages in risk oversight through the project approval process*, whereby projects reaching a threshold level of expected revenues require Board approval.  Fixed-price contracts have a lower threshold level than reimbursable-type contracts because of their potential price and financial risks.  *In reviewing projects, the Board is presented with management's assessment of a particular project's cost exposure associated with operations risk, liabilities and funding risks*, among others.  In this manner, KBR's *Board is engaged in risk oversight at the outset of the largest projects, which could have a material effect on KBR's operations*.

> The Board is also engaged in risk oversight through regular reports from its Audit Committee.  *The Audit Committee is charged with reviewing with management the company's major financial risk exposures*, as well as others areas of risk

exposure if requested to do so by the Board, *and the steps management has taken to monitor and mitigate those exposures*. The Audit Committee receives periodic reports from management on these areas of potential exposure, including litigation, liquidity and capital resources, *financial reporting and disclosures*, regulatory and tax risks, among others. The Audit Committee also receives reports from management *regarding compliance risks* and Code of Business Conduct matters. The Audit Committee also reviews at least annually KBR's policies and guidelines that govern the process by which risk assessment and enterprise risk management is undertaken. The Audit Committee also receives *in-depth* periodic reports from management regarding specific processes designed to monitor and manage risk, *such as project estimation procedures* and foreign exchange risk management. The Audit Committee conducts private sessions with KBR's Chief Financial Officer, Vice President of Internal Audit and General Counsel at each regular meeting and with KBR's independent auditors at each meeting prior to the release of quarterly and annual results. *The Audit Committee Chairman gives a report of the Audit Committee's activities to the full Board at each regular meeting* and in this manner the entire Board is informed of matters that the Audit Committee determines warrant full Board discussion.

(Emphasis added.)

32.     The proxy statement also described the Company's clawback provision in cases of financial restatement:

> [O]ur Performance Pay Plan (described in the section titled "B. Short-Term Incentives (Annual)") includes a clawback provision that allows the Compensation Committee to seek recovery of any short-term incentive award amounts determined to be an overpayment due to any restatement of our financial results that impact the performance metrics on which the short-term incentive awards were calculated. The Compensation Committee will adopt all clawback provisions required by the Dodd-Frank Act.

33.     On April 12, 2013, the Company filed with the SEC a response to the SEC's April 1, 2013 comment letter in which it agreed to supplement its disclosures regarding the accounting for contract cost and estimates. In the response, KBR stated that it intended to amend its disclosures regarding material revisions in contract estimates in the Company's upcoming Form 10-Q to state substantially the following:

> During the quarter ended March 31, 2013, significant revisions to contract estimates had a $[TBD] million positive impact on the segment operating income of our Hydrocarbons business group as a result of revised project cost estimates on two of projects in our Gas Monetization business unit.

The Company also stated that it would make the following additional disclosure in the upcoming Form 10-Q regarding the amount of pre-contract costs deferred, if material:

> Pre-contract costs incurred in anticipation of a specific contract award are deferred only if the costs can be directly associated with a specific anticipated contract and their recoverability from that contract is probable.  Pre-contract costs related to unsuccessful bids are written off no later than the period we are informed that we are not awarded the specific contract.  Costs related to one-time activities such as introducing a new product or service, conducting business in a new territory, conducting business with a new class of customer or commencing new operations are expensed when incurred.  We had no deferred pre-contract costs at March 31, 2013 and December 31, 2012.

34.     On April 25, 2013, the Company issued a press release announcing its first-quarter 2013 results and filed its Form 10-Q for that period with the SEC.  The Company announced net income for the quarter was $88 million, or $0.59 per diluted share, slightly below the results from the same period of the previous year.  Operating income for the quarter was $133 million, compared to $112 million during the same period of 2012.  The Company disclosed Services revenue was $485 million, up $137 million, or 39%, and services job income was $31 million, up $3 million, or 11%, "primarily related to several new module fabrication and turnaround projects ramping in Canada."  The Company's Form 10-Q for the quarter contained certifications by defendant Utt, stating that the Company's internal controls were effective.  The press release announcing the results also stated:

> "KBR's first quarter performance was consistent with our expectations.  We delivered $0.59 of EPS on strong project execution across all of KBR's businesses, including on the five problem projects we discussed in the fourth quarter where no incremental provisions were taken in the first quarter," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR.

* * *

> During the first quarter of 2013, KBR had share repurchases of $6 million, capital expenditures of $20 million and pension contributions of $7 million for total cash deployment of $33 million.

35.     The Company's Form 10-Q for the quarter also contained the following additional disclosures as requested by the SEC:

> During the quarter ended March 31, 2013, significant revisions to contract estimates had a $38 million positive impact on the segment operating income of our Hydrocarbons business group as a result of revised project estimates on two of our projects in our Gas Monetization business unit.
>
> * * *
>
> Pre-contract costs incurred in anticipation of a specific contract award are deferred only if the costs can be directly associated with a specific anticipated contract and their recoverability from that contract is probable.  Pre-contract costs related to unsuccessful bids are written off no later than the period we are informed that we are not awarded the specific contract.  Costs related to one-time activities such as introducing a new product or service, conducting business in a new territory, conducting business with a new class of customer or commencing new operations are expensed when incurred.  We had no deferred pre-contract costs at March 31, 2013 and December 31, 2012

36.     On May 20, 2013, the Company disclosed that as a result of the votes solicited at the annual meeting on May 16, 2013, defendants Blount, Carroll, Cook, Curtiss, Moore, and Utt were reelected to the Board.

37.     On July 25, 2013, the Company issued a press release announcing its second-quarter 2013 results and filed its Form 10-Q for that period with the SEC.  The Company announced net income for the quarter was $90 million, or $0.61 per diluted share, again slightly below the results from the same period of the previous year.  Operating income for the quarter was $123 million, compared to $129 million during the same period of 2012.  The Company disclosed Services revenue was $622 million, up $197 million, or 46%, and services job income was $38 million, up $9 million, or 31%, "primarily related to increased activity on several module fabrication and turnaround projects in Canada as well as increased work activity in Industrial Services and Building Group."   The Company's Form 10-Q for the quarter contained

certifications by defendant Utt, stating that the Company's internal controls were effective.  The press release announcing the results also stated:

> "KBR delivered solid project execution in the second quarter, driving job income and job income margins up 8% and 153 basis points year-over-year, respectively," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR.  "We also made strong progress on bookings in North America, with key strategic wins in Downstream with nearly $1 billion in EPC awards in ammonia and ethylene, with the technology licenses awarded related to these downstream wins, and with a North American FEED award for the Pacific Northwest LNG project in Canada in our Gas Monetization business.  These wins help to affirm KBR's position as a premiere North American contractor."

38.     On September 26, 2013, the Company announced that its Chief Financial Officer had resigned.

39.     On October 24, 2013, the Company issued a press release announcing its third-quarter 2013 results and filed its Form 10-Q for that period with the SEC.  The Company announced net income for the quarter was $24 million, or $0.16 per diluted share, down from $81 million and $0.55, respectively, during the same quarter of the previous year.  Operating income for the quarter was $166 million, compared to a $11 million operating loss during the same period of 2012.  The Company disclosed Services revenue was $494 million, up $75 million, or 18%, and services job income was $31 million, up $16 million, or 107%, "primarily related to $21 million in charges in the third quarter of 2012 due to increased cost estimates to complete two construction projects in the United States that did not recur in the third quarter of 2013, as well as increased activity on several module fabrication projects in Canada."  The Company's Form 10-Q for the quarter contained certifications by defendant Utt, stating that the Company's internal controls were effective.  The press release announcing the results also stated:

> "The third quarter was highlighted by a strong, 1.2x book-to-bill ratio and cash flow from operations of $178 million.  The quarter was unfavorably impacted by the adverse tax ruling related to the separation from our prior parent, several non-operational discrete tax items and the delay of key project close-out items

originally forecast in the quarter," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR.   "Looking forward, we continue to see a strong opportunity set of major projects across all of our businesses; however, we expect the near term competitive environment for new awards to continue."

* * *

KBR expects 2013 EPS to be at the low end of the previous guidance range of between $2.55 and $2.90, excluding charges related to the tax dispute with KBR's former parent.

40.     On December 16, 2013, the Company announced that defendant Utt would retire from his role as Chairman, President, and CEO in 2014.  The press release sated defendant Utt would continue in his current positions until a new CEO was appointed.

2014 Fiscal Year

41.     On February 27, 2014, the Company issued a press release announcing its fourth-quarter and full-year 2013 results and filed its Form 10-K for the year with the SEC.  The Company announced net income for the quarter was $27 million, or $0.18 per diluted share, down slightly from the same quarter of the previous year.  Gross profit for the quarter was $84 million, compared to $60 million during the same period of 2012.[1]  The Company disclosed Services revenue for the quarter was $460 million, up $27 million and gross profit for Services was $10 million, up $ 62 million, "primarily due to $62 million in Q4 2012 charges related to cost increases to complete three construction projects in the United States in addition to increased activity on several module fabrication contracts in Canada."  The Company stated the fourth-quarter results included "a $20 million charge for increased costs from delays in project commissioning, project taxes, and other costs" for a project that was provisionally accepted in January 2014," after the period of the 2013 10-K.  The press release announcing the results also stated:

---

[1] The press release did not explain why the Company ceased describing this figure as operating income.

"The fourth quarter was highlighted by a strong 1.1x book-to-bill ratio and cash flow from operations of $209 million.  We're also pleased our Board of Directors has authorized a new $350 million share repurchase program," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR.  "However, earnings for the quarter were significantly less than anticipated."

\* \* \*

Net income attributable to KBR was $229 million, or $1.54 per diluted share, in fiscal year 2013, compared with net income attributable to KBR of $144 million, or $0.97 per diluted share, in fiscal year 2012.

42.     Also on February 27, 2014, the Company filed its Form 10-K for the 2013 fiscal year (the "2013 10-K") with the SEC.  In the Form 10-K, KBR described that during the third quarter of 2013, the Company reorganized its Hydrocarbons segment into two segments: (a) Gas Monetization; and (b) Hydrocarbons.  As a result, KBR now had five reportable segments.

43.     The 2013 10-K disclosed that revenues from the Company's business in Canada had increased from 3% in 2011, to 6% in 2012, to 10% in 2013, making the Canada business the third-largest geographic location for KBR by revenue.  KBR's 2013 operating income was $471 million, compared to $299 in 2012.  In 2013, the Company's total revenue was approximately $7.2 billion, of which $2.1 billion, an increase of 28%, or $451 million, was derived from the Services segment.  During 2013, the Services segment was KBR's second-highest revenue producing segment behind the Gas Monetization segment which had $2.2 billion in revenues. The Company's 2013 Services gross profit increased $106 million from 2012.  The Form 10-K stated the Services revenue increase was "primarily driven by construction activities on oil sands-related projects in western Canada....  We expect western Canada to remain a strong market for our construction services in 2014."

44.     The 2013 10-K, like that of the previous year, contained a section titled "Critical Accounting Policies" which, among other things, contained a subheading describing KBR's

accounting for "Engineering and Construction Contracts."  This subheading stated "[a]t least quarterly, significant projects are reviewed in detail by senior management," specifically in connection with cost estimates.

45.     On March 4, 2014, the Company's then-Chief Accounting Officer resigned.

46.     On April 1, 2014, the Company filed its definitive proxy statement in advance of the annual meeting of shareholders to be held May 15, 2014.  The proxy statement solicited shareholder votes for the reelection of defendants Blount, Carroll, Cook, Curtiss, Moore, Lyles, and Slater.  The proxy statement stated that each of KBR's incumbent directors "attended seventy-five percent or more of the aggregate of all meetings of the Board and of committees on which they served during the periods that they served during 2013."  According to the proxy statement, defendant Carroll, formerly Lead Director, began serving as the Chairman of the Board on March 31, 2014, as defendant Utt had decided not to stand for re-election as a director. The proxy statement stated "KBR's Corporate Governance Guidelines provide for the Lead Director to perform a strong role in the leadership of the Board."  As of April 2013, the members of the Audit Committee were defendants Blount, Lyles, and Moore.  Curtiss was the Chairman. As it did in 2012, the KBR proxy statement also stated:

> KBR's Board of Directors considers risk oversight to be an integral part of its role, and discussions regarding risks faced by the company are part of its meetings and deliberations throughout the year.  Furthermore, at least twice each year, the entire Board receives a report from management regarding significant strategic, operational, financial, and hazard risks determined by management to have a potential significant impact on the company as a whole.  The risk report involves both current and emerging risks and is the culmination of a process involving input from all business groups and executive leadership.  The risk report includes specific strategic, operational, financial and hazard risks, the perceived trend for each of those specific risks — whether increasing, decreasing or stable — and the measures being taken to monitor and mitigate those risks.

> In addition to the enterprise risk management process described above, the Board of Directors also engages in risk oversight in the area of project revenues.  At

each meeting, the Board reviews aggregated KBR project revenues measured by type of contract — fixed-price or reimbursable — by country, client and project backlog.  In this manner, the Board is informed of the overall risk profile of KBR's project revenues.  The Board also engages in risk oversight through the project approval process, whereby projects reaching a threshold level of expected revenues require Board approval.  Fixed-price contracts have a lower threshold level than reimbursable-type contracts because of their potential price and financial risks.  In reviewing projects, the Board is presented with management's assessment of a particular project's cost exposure associated with operations risk, liabilities and funding risks, among others.  In this manner, KBR's Board is engaged in risk oversight at the outset of the largest projects, which could have a material effect on KBR's operations.

The Board is also engaged in risk oversight through regular reports from its Audit Committee.  The Audit Committee is charged with reviewing with management the company's major financial risk exposures, as well as others areas of risk exposure if requested to do so by the Board, and the steps management has taken to monitor and mitigate those exposures.  The Audit Committee receives periodic reports from management on these areas of potential exposure, including litigation, liquidity and capital resources, financial reporting and disclosures, regulatory and tax risks, among others.  The Audit Committee also receives reports from management regarding compliance risks and Code of Business Conduct matters.  The Audit Committee also reviews at least annually KBR's policies and guidelines that govern the process by which risk assessment and enterprise risk management is undertaken.  The Audit Committee also receives in-depth periodic reports from management regarding specific processes designed to monitor and manage risk, such as project estimation procedures and foreign exchange risk management.  The Audit Committee conducts private sessions with KBR's Chief Financial Officer, Vice President of Internal Audit and General Counsel at each regular meeting and with KBR's independent auditors at each meeting prior to the release of quarterly and annual results.  The Audit Committee Chairman gives a report of the Audit Committee's activities to the full Board at each regular meeting and in this manner the entire Board is informed of matters that the Audit Committee determines warrant full Board discussion.

47.     The proxy statement also described the Company's clawback provision in cases

of restatement:

Performance Pay Plan (described in the section titled "Short-Term Incentives (Annual)") includes a clawback provision that allows the Compensation Committee to seek recovery of any short-term incentive award amounts determined to be an overpayment due to any restatement of our financial results that impact the performance metrics on which the short-term incentive awards were calculated. The Compensation Committee will adopt all clawback provisions required by the Dodd-Frank Act.

48.     On April 9, 2014, the Company announced that Stuart Bradie ("Bradie") had been named President and Chief Executive Officer of KBR, effective June 2, 2014.  The press release stated Bradie would become a director when he joined the Company.

### THE TRUTH IS REVEALED

49.     On May 5, 2014, the Company issued a press release announcing that it would restate its financial statements for the year 2013.  The press release stated that the Company would be forced to take "pre-tax charges of $158 million, consisting of the reversal of $23 million previously recognized pre-tax profits and the recognition of approximately $135 million in pre-tax estimated losses at completion" *and* KBR forecasted additional negative cash flow impact of "less than $45 million."  In particular, the press release stated:

> In connection with the preparation of KBR's Form 10-Q for the three months ending March 31, 2014, we determined that the estimated costs to complete seven Canadian pipe fabrication and module assembly contracts within our Services business segment that were awarded during 2012-2013 will result in pre-tax charges of $158 million, consisting of the reversal of $23 million in previously recognized pre-tax profits and the recognition of approximately $135 million in pre-tax estimated losses at completion.  The negative cash impact associated with the work released to date under the seven contracts has largely been incurred and the forecast net negative cash flow to complete this work is expected to be less than $45 million. Our review of this matter is ongoing and therefore the amounts previously noted are subject to change.  We believe that the majority of these losses should have been recognized in our consolidated financial statements for the year ended December 31, 2013.

> The seven contracts in question are with third-party clients and do not impact other KBR projects.  Six of the contracts will be completed during 2014 or in early 2015.  The seventh contract is a master services-type agreement that provides our client with the right, but not the obligation, to place new pipe fabrication and module assembly orders until 2017.  The pre-tax losses noted above include estimated losses only for work released to us through March 31, 2014.  Future work orders, if any, will be accounted for at the time of each release.  We have begun discussions with our client under the master services agreement regarding a market-based cost adjustment.  At this time, we can provide no assurance that such discussions will be successfully concluded.  The estimated losses noted above do not assume recovery from clients for quantity and/or cost increases caused by client-directed actions.  We believe we are

entitled to certain recoveries from our clients but since collection remains uncertain, we will record any such recoveries if, and when, mutually agreed.

KBR's self-perform pipe fabrication and module assembly activities are limited to our Edmonton, Alberta operations. The contracts referenced herein were part of a rapid expansion of work at these operations and resulted in increased internal and external costs and adversely impacted our historical module assembly productivity rates.

Separately, during the preparation of our Form 10-Q for the three months ending March 31, 2014, we identified an overstatement error in our revenue recognition on a long-term construction project approximating $9.0 million pre-tax ($6.3 million after tax) and an error which resulted in an understatement of our income tax provision of approximately $6.5 million that had not been properly included in the Consolidated Statement of Income for the year ended December 31, 2013.

50.     The accompanying Form 8-K also disclosed that the restatement had triggered a

default in certain of the Company's credit covenants:

On December 2, 2011, KBR, Inc. ("KBR") entered into a $1 billion, five-year unsecured revolving credit agreement with a syndicate of international banks. Pursuant to the terms of that credit agreement, it is an event of default if any certificate furnished to the bank syndicate is incorrect or proves to have been incorrect, when made or deemed made. As described in Item 4.02 below, it has been determined that KBR's previously issued consolidated financial statements as of and for the year ended December 31, 2013 should no longer be relied upon. We do not currently expect that the corrections to our 2013 consolidated financial results, and any impact to our March 31, 2014 results, will cause a financial covenant breach under our credit agreement; however, the management certifications we made to our financial institutions under the credit agreement are no longer valid. Without further agreement from our bank syndicate, KBR is prohibited from requesting the issuance of any new letters of credit or loan advances under its committed and uncommitted lines of credit, which could materially impact its business operations and liquidity. Under certain circumstances, KBR may also be required to provide cash collateral to secure outstanding letters of credit or surety bond positions. As of April 30, 2014, KBR estimates that it had outstanding letters of credit of approximately $632 million as well as consolidated cash and equivalents of approximately $900 million. We are currently in discussions with our bank syndicate to reach an amicable resolution of this matter.

* * *

As a result of the errors described above, on May 1, 2014, the Audit Committee of the Board of Directors of KBR, in consultation with and based on the

recommendation of management, concluded that KBR's consolidated financial statements as of and for the year ended December 31, 2013 should be restated to correct for the aforementioned errors and that, accordingly, KBR's previously issued consolidated financial statements for 2013 should no longer be relied upon. Additionally, KBR's earnings and press releases and similar communications should no longer be relied upon to the extent that they relate to these consolidated financial statements.  As soon as practicable, we expect to amend KBR's Form 10-K for the year ended December 31, 2013 to restate the financial statements and correct the errors identified herein, and to revise related information, including our discussion of KBR's internal controls and procedures.  As a result, we will not file KBR's 10-Q for the three months ending March 31, 2014 until after filing of the amended Form 10-K.  Given the ongoing nature of our review, the forecast filing date for the amended 2013 Form 10-K and Form 10-Q for the three months ending March 31, 2014 is uncertain. KBR's management is continuing to review these matters to ensure it has determined the causes for these errors and will continue to consider the effect of these errors on our prior conclusions regarding our internal control over financial reporting and disclosure controls and procedures as of the end of the applicable period.  We will amend, as necessary, any disclosures pertaining to our evaluation of such controls and procedures in connection with our amended Annual Report on Form 10-K for the year ended December 31, 2013, and in our Form 10-Q for the three months ending March 31, 2014.

* * *

The KBR Audit Committee, comprised of members of its Board of Directors, has retained independent legal and accounting advisors to review these matters and to advise the Committee, which is in addition to the review being conducted by KBR's management.  The Audit Committee has discussed the matters described in this Current Report with KPMG LLP, KBR's independent registered public accounting firm.

As a result of the above items, KBR is also withdrawing its previously issued guidance for 2014.  We expect to provide updated guidance later this year.  In keeping with our previously announced intent to return capital to shareholders, between February 27, 2014 and April 30, 2014, KBR repurchased approximately 3.4 million shares of its common stock at an average price of $27.29 for a total of $94 million.

51.    On May 6, 2014, UBS downgraded KBR stock from Buy to Netural and lowered the price target more than 20% from $33 per share to $26 per share on concerns about earnings visibility through 2014.   The UBS report mentioned the contract issues disclosed in the restatement as a reason for the downgrade and stated that a further downside could exist.

52.     On May 13, 2014, the Company filed Form 8-K disclosing it had obtained a

waiver for its violation of covenants for certain credit agreements:

> On May 9, 2014, KBR, Inc. ("KBR") received a Waiver under its Five Year
> Revolving Credit Agreement dated as of December 2, 2011 (the "Credit
> Agreement"), providing for the waiver of compliance with certain representations,
> warranties and covenants of the Credit Agreement.  The Waiver relates to certain
> defaults that were triggered, or might have been triggered, arising from KBR's
> previously announced restatement of its December 31, 2013 financial statements,
> and from the timing and delivery of financial statements for the three months
> ended March 31, 2014, and related documents, due to delays caused by the
> pending restatement, as described in KBR's Current Report on Form 8-K filed
> with the Securities and Exchange Commission on May 5, 2014.  Together, the
> Waiver and the Credit Agreement require that KBR deliver its amended Form 10-
> K for the year ended December 31, 2013, its Form 10-Q for the three months
> ending March 31, 2014, and Form 10-Q for the three months ended June 30,
> 2014, and related certificates by August 30, 2014.  After giving effect to the
> Waiver, no event of default exists under the Credit Agreement as a result of the
> previously announced restatement, and KBR may request the issuance of new
> letters of credit and loan advances under the Credit Agreement in accordance with
> its terms.  The Waiver is filed as Exhibit 10.1 to this Form 8-K.

53.     Also on May 13, 2014, the Company disclosed its inability to timely file its

quarterly report for the quarter ended March 31, 2014.

## DAMAGES TO THE COMPANY

54.     KBR has been, and will continue to be, severely damaged and injured by the

Director Defendants' misconduct.  As a direct and proximate result of the Director Defendants'

conduct, KBR has been seriously harmed and will continue to be.  Such harm includes, but is not

limited to:

      a.     costs incurred in compensation and benefits paid to defendants that
           breached their duties to the Company;

      b.     costs due to increased cost of credit related to the renegotiation of the
           Company's credit facilities after breaching loan covenants;

     c.       costs incurred due to the Company's buy-back of KBR common stock at inflated share prices;

     d.       costs incurred due to the retention of financial advisors and legal counsel in order to assess the scale of the restatement and to restate the financial results;

     e.       substantial loss of market capital;

     f.       costs already incurred and to be incurred defending the pending securities fraud class actions; and

     g.       any fines that are a result of the Company's violations federal and state law.

55.     In addition, KBR's business, goodwill, and reputation with its business partners, regulators, and shareholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

56.     The wrongdoing complained of herein has irreparably damaged KBR's corporate image and goodwill.  For at least the foreseeable future, KBR will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that KBR's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

57.     Plaintiff brings this action derivatively in the right and for the benefit of KBR to redress injuries suffered, and to be suffered, by KBR as a direct result of breaches of fiduciary duty by the individual defendants.  KBR is named as a nominal defendant solely in a derivative

capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

58.     The current Board of KBR consists of the following seven Director Defendants: Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater.  Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the KBR Board would be futile, and therefore, excused.  This is because despite knowing that the Company suffered from inadequate internal controls, the Board concealed this fact from the public, declined to institute functioning internal controls, and then permitted the Company to issue misleading and untruthful disclosures.  By participating in this course of conduct, the Director Defendants exposed the Company to damage and injury.  Consequently, the Director Defendants face a substantial risk of liability for breaches of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand.  Thus, demand on the Board is futile, and therefore excused.

**Demand Is Excused Because A Majority Of The Director Defendants Face A Substantial Likelihood Of Liability Based Upon Their Actions**

*Defendants, Blount, Curtiss, Lyles, and Moore Are Active Participants Of The Audit Committee*

59.     Defendants Blount, Curtiss, Lyles, and Moore, a majority of the Director Defendants, are the members of KBR's Audit Committee.  According to its charter, the Audit Committee's primary responsibility is oversight of "the integrity of the financial statements of the Corporation,"  "the compliance by the Corporation with legal and regulatory requirements," and "the performance of the Corporation's internal audit function."

60.     According to the Company's most recent two proxy statements excerpted above, the Audit Committee is charged with reviewing with management, the company's major financial risk exposures and the steps being taken to monitor and mitigate such exposures.  The Audit Committee receives reports from management regarding areas potential exposure such as

litigation, financial reporting, and disclosure.  The most recently filed proxy statement stated the Audit Committee "receives in-depth periodic reports from management regarding specific process designed to monitor and manage risk, *such as project estimation procedures*…" (Emphasis added.)  The Audit Committee further conducts private sessions with KBR's Chief Financial Officer and Vice President of Internal Audit "at each meeting prior to the release of quarterly and annual results."  According to the these four defendants themselves, as stated in the 2013 Audit Committee Report included in the 2013 proxy statement, during the 2013 fiscal year, the Audit Committee reviewed and discussed with management and the Company's independent auditor reports on internal controls over financial reporting and the adequacy and effectiveness of the Company's disclosure controls and procedures, reviewed and discussed with management major financial risk exposures, and "recommended to the Board of Directors that the audited financial statements be included in KBR's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, for filing with the SEC."

61.    The KBR Audit Committee met six times during 2013.  As a result of these six meetings and the Audit Committee's regular updates with management and detailed review of risk issues, defendants Blount, Curtiss, Lyles, and Moore knew:

      a.    In 2012, KBR's operating income dropped nearly 50% due in significant part to previously over-estimated contract costs for U.S. construction projects;

      b.    The Company's cost estimates for construction contracts are sufficiently material to the Company's business that the Company's 2012 and 2013 Forms 10-K specifically contained a description of them under "Critical

Accounting Policies" and stated that cost estimates for significant projects are reviewed "in detail" by senior management "at least quarterly";

c.    After filing the 2012 Form 10-K, the SEC specifically requested enhanced disclosure regarding material revisions to contract costs; and

d.    KBR's 2013 Form 10-K disclosed $62 million in charges that resulted in an operating income decline for the year in the Services segment related to contract cost underestimation.

62.    Due to the foregoing facts and their being bound by the 2009 SEC Permanent Injunction, defendants Blount, Curtiss, Lyles, and Moore, were aware: (a) the estimation of contract costs was a material element to the Company's financial statements and forecasts; (b) improper estimation of contract costs presented a serious financial risk to KBR; and (c) during 2012 and 2013, the Company repeatedly and significantly underestimated contract costs materially negatively impacting the Company's financial results.

63.    In light of the foregoing, and in the absence of information to suggest that the Audit Committee did not engage in its regular review of risks and consultation with senior management, these four defendants knew the Company's internal controls were deficient, knew that the internal controls deficiencies presented a serious financial risk to KBR, and declined to fix them or halt statements that they knew, or but for the exercise of reasonable diligence should have known, were inaccurate and misleading.  Due to their breach of their duties, any demand upon defendants Blount, Curtiss, Lyles, and Moore is futile.

_The Entire Board Failed To Institute Sufficient Internal Controls And Assure Truthful Representations_

64.    Each of the Director Defendants, Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater, were members of the Board since prior to 2013 fiscal year.  According to the

Company's most recent two proxy statements excerpted above, "KBR's Board of Directors considers risk oversight to be an integral part of its role, and discussions regarding risks faced by the company are part of its meetings and deliberations throughout the year."  Twice each year, each of Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater received a report from management regarding significant strategic, operational, financial, and hazard risks.  This risk report included specific risks and the measures being taken to monitor and mitigate those risks.

65.     In addition, according to the 2013 proxy statement, defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater engage in risk oversight specifically in the area of "projected revenues."  "At each meeting, the Board reviews aggregated KBR project revenues measured by type of contract… by country, client and project backlog.  In this manner the Board is informed of the overall risk profile of KBR's project revenues."  Defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater also were engaged in a project approval process whereby they reviewed projects expected to result in material revenue.  The proxy statement stated that defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater were "engaged in risk oversight at the outset of the largest projects, which could have a material effect on KBR's operations."  Finally, the Audit Committee gives a report on its activities "to the full Board at each regular meeting and in this manner the entire Board is informed of matters that the Audit Committee determines warrant full Board discussion."

66.     Defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater met without management seven times in 2013, and more times in the presence of management.  As a result of these meetings and the foregoing, defendants Blount, Curtiss, Lyles, and Moore knew:

a.     In 2012, KBR's operating income dropped nearly 50% due in significant part to previously over-estimated contract costs for U.S. construction projects;

b.     The Company's cost estimates for construction contracts are sufficiently material to the Company's business that the Company's 2012 and 2013 Forms 10-K specifically contained a description of them under "Critical Accounting Policies" and stated that cost estimates for significant projects are reviewed "in detail" by senior management "at least quarterly";

c.     After filing the 2012 Form 10-K, the SEC specifically requested enhanced disclosure regarding material revisions to contract costs; and

d.     KBR's 2013 Form 10-K disclosed $62 million in charges that resulted in an operating income decline for the year in the Services segment related to contract cost underestimation.

67.     Due to the foregoing facts and their being bound by the 2009 SEC Permanent Injunction, defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater were aware: (a) the estimation of contract costs was a material element to the Company's financial statements and forecasts; (b) improper estimation of contract costs presented a serious financial risk to KBR; and (c) during 2012 and 2013, the Company repeatedly and significantly underestimated contract costs materially negatively impacting the Company's financial results.

68.     In light of the foregoing, and in the absence of information to suggest that the Board did not engage in its regular review of risks and consultation with senior management, these four defendants knew the Company's internal controls were deficient, knew that the internal controls deficiencies presented a serious financial risk to KBR, and declined to fix them

or halt statements that they knew, or but for the exercise of reasonable diligence should have known, were inaccurate and misleading.  Due to their breach of their duties, any demand upon defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater is futile.

*Demand Is Excused As To The Pre-2009 Directors, Defendants Blount, Carroll, Curtiss, Lyles, and Slater*

69.     Defendants Blount, Carroll, Curtiss, Lyles, and Slater, a majority of the Director Defendants, have served on the Board since at least 2007.  In 2009, while defendants Blount, Carroll, Curtiss, Lyles, and Slater were members of the Board, KBR pled guilty in this Court to criminal charges of conspiring to violate the FCPA and violating the FCPA.  Pursuant to the guilty plea, the Company was jointly and severally liable for a criminal penalty of $402 million, of which KBR ultimately paid $20 million.  Also in 2009, the Company settled a civil enforcement action by the SEC under which KBR was jointly and severally liable for a penalty of $177 million, all of which was paid by co-defendants.  In settling the SEC action, the Company agreed to a three-year period of organizational probation and entered into a permanent injunction.

70.     The 2009 FCPA problems are relevant hereto because a central allegation of the SEC's complaint was that the Company accomplished its multi-year bribery scheme by false accounting:[2] "numerous KBR… company records" "falsely characterized" bribes paid to Nigerian officials.  The SEC complaint alleged that KBR violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act regarding company records and internal controls, as well as section 13(b)(5) of the Exchange Act regarding the falsification of books and records.[3]  Section 13(b)(2)(A) of the Exchange Act requires companies to keep accurate books, records, and

---

[2] *SEC v. KBR*, *Inc.*, *et al.,* C.A. No. 4:09-cv-00399, Southern District of Texas (ECF No. 1), Filed February 11, 2009.
[3] 15 U.S.C §§ 78m(b)(5), 78m(b)(2)(A) and 78m(b)(2)(B).

accounts which fairly reflect the transactions entered into.   Section 13(b)(2)(B) requires companies to devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles ("GAAP").   Section 13(b)(5) of the Exchange Act provides: "No person shall knowingly circumvent or knowingly fail to implement a system of internal accounting controls or knowingly falsify any book, record, or account" as defined in that section.

71.   In order to resolve the SEC's claims, Blount, Carroll, Curtiss, Lyles, and Slater consented to a final judgment permanently enjoining KBR against the violations of sections 13(b)(5), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act.[4]   Attached to the executed final judgment was a Certificate of Corporate Resolution containing a resolution adopted by KBR on February 6, 2009, permitting the Company's general counsel to approve the Company's consent to the final judgment.  By adopting the February 6, 2009 resolution, defendants Blount, Carroll, Curtiss, Lyles, and Slater were on actual notice of the content of the final judgment.

72.   Further, the final judgment itself expressly applied to defendants Blount, Carroll, Curtiss, Lyles, and Slater: KBR's officers, agents, servants, employees, attorneys, *and all persons in active concert or participation with them who receive actual notice of this Final Judgment*… are permanently restrained and enjoined from violation, directly or indirectly" sections 13(b)(5), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act.

73.   However, these five defendants, knowing the harm those inadequate internal controls had wrought on the Company and having been on actual notice of a permanent injunction against further defective controls nevertheless permitted KBR to again suffer from inadequate internal controls over financial disclosure.   In light of the SEC's permanent

---

[4] *SEC v. KBR, Inc.*, (ECF No. 6), Filed February 11, 2009.

injunction, the failure of defendants Blount, Carroll, Curtiss, Lyles, and Slater ensure KBR's internal controls were adequate could not have been in good faith, particularly with their knowledge of the cost estimate problems in 2012 and 2013. These defendants were specifically and directly admonished by the SEC not to be involved in any further bad accounting or deficient control situations, and yet they were again a few short years later in a circumstance in which any observer could tell the Company's cost estimation procedures were unreliable. The Company has now been seriously harmed. As a result, defendants Blount, Carroll, Curtiss, Lyles, and Slater face an even higher likelihood of liability for their wrongdoing detailed herein.

74.    As particularized herein, to properly prosecute this lawsuit, the Director Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This they have refused to do thus far, and will not do in the future. A majority of the Director Defendants are exposed to potential liability for breaching their fiduciary duties by consciously or recklessly declining to institute functioning internal controls even though they knew or were reckless in not knowing that the Company's internal controls were seriously deficient and accounting chicanery was rampant. Thus, demand on the Director Defendants is futile.

<u>**COUNT I**</u>
<u>**Breach of Fiduciary Duty**</u>

75.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

76.    Each defendant owes and owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of KBR's business and affairs, particularly with respect to maintaining compliance with applicable laws and regulations in core areas of the Company's business, as well as controls over disclosure.

77.     Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of KBR.

78.     In breach of their fiduciary duties owed to KBR, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to act in good faith in their roles overseeing KBR's business, rendering them personally liable to the Company for breaching their fiduciary duties.

79.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, KBR has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
## Abuse of Control

80.     Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

81.     Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence KBR, for which they are legally responsible.

82.     As a direct and proximate result of defendants' abuse of control, KBR has sustained significant damages.

83.     As a direct and proximate result of defendants' breaches of their fiduciary obligations, KBR has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

84.     By reason of the foregoing, KBR has been damaged.

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.      Declaring that Plaintiff may maintain this action on behalf of KBR and that Plaintiff is an adequate representative of the Company;

B.      Declaring that the Director Defendants have breached their fiduciary duties to KBR;

C.      Determining and awarding to KBR the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.      Directing KBR and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect KBR and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

   1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

   2.      a provision to permit the shareholders of KBR to nominate at least three candidates for election to the Board;

   3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.    Determining and awarding to KBR exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.    Awarding KBR restitution from defendants, and each of them;

G.    Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.    Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

DATED:  May 27, 2014.

Respectfully submitted,

_____*/s/ Thomas E. Bilek*_____
Thomas E. Bilek
TX Bar No. 02313525 / SDTX Bar No. 9338
**THE BILEK LAW FIRM, L.L.P.**
700 Louisiana, Suite 3950
Houston, TX  77002
(713) 227-7720
FAX (713) 227-9404

**ATTORNEYS FOR PLAINTIFF**

**OF COUNSEL:**

Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
HARWOOD FEFFER LLP
488 Madison Avenue
New York, NY  10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630