## UNITED STATES DISTRICT COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| PAVEL BUTORIN, Derivatively on Behalf of Nominal Defendant KBR, INC., <br><br>       Plaintiff, <br><br>   v. <br><br> W. FRANK BLOUNT, LOREN K. CARROLL, JEFFREY E. CURTISS, LINDA Z. COOK, LESTER L. LYLES, JACK B. MOORE, RICHARD J. SLATER, JOHN R. HUFF, and WILLIAM P. UTT, <br><br>      Defendants, <br><br> and <br><br> KBR, INC., <br><br>      Nominal Defendant. | Case No. 1:15-cv-283-LPS |

### SECOND AMENDED VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Pavel Butorin ("Plaintiff"), by and through his undersigned attorneys, brings this second amended derivative complaint for the benefit of nominal defendant, KBR, Inc. ("KBR" or the "Company"), against certain current and former members of its Board of Directors (the "Board") seeking to remedy defendants' breaches of fiduciary duties, abuse of control, violations of §14(a) of the Securities Exchange Act, and unjust enrichment. All facts relating to Plaintiff and his own acts are pled on personal knowledge, while other facts are pled upon information and belief.

### NATURE AND SUMMARY OF THE ACTION

1. KBR is a global engineering, construction, and services company. Due to the nature of its business, the ability to account accurately for the costs of project contracts is critical

to KBR's financial reporting.   KBR's public filings refer to its accounting for contracts as "fundamental" to its business.

2.      During 2013, KBR's reported financial results showed steady profits in its Services segment caused by construction contracts for oil and gas facilities in Canada.   The Company, analysts, and investors viewed KBR's financial success at the time to be highly dependent on strong results from these Canadian contracts.   However, unbeknownst to the public the Canadian contracts were suffering large undisclosed losses.

3.      In May 2014, KBR restated its financial statements for the third and fourth quarters, and full year of 2013.   In the restatement, the Company admitted to violating Generally Accepted Accounting Principles ("GAAP") by failing to properly account for costs, profits, and losses on the key Canadian contracts under the "percentage-of-completion" method.   As a result of the improper accounting, the Company's reported operating income in the Services segment was artificially inflated by over 500% during 2013.   Worse still, reported Company-wide net income was overstated by over 300% during the third quarter of 2013, over 200% during the fourth quarter of 2013, and over 60% for the year.

4.      It is unsurprising that there was an accounting restatement because throughout 2013 and prior to the restatement in 2014, defendants were repeatedly presented with facts showing that the Company's internal controls were inadequate and the Company's financial statements repeatedly and materially underestimated costs for various contracts.   For example, when KBR's 2012 operating income came in at less than half of the Company's 2011 operating income, underestimated contract costs were listed as a significant factor.   Then, after the Company filed its 2012 Form 10-K, the Securities and Exchange Commission ("SEC") requested it disclose additional information regarding material revisions to contract costs.   According to

KBR's 2013 Form 10-K, the Services segment's operating income declined from the previous year due in large part to $62 million in charges related to the underestimation of contract costs. However, the Director Defendants did not take corrective action to repair the Company's deficient controls or to ensure that KBR's financial statements were accurate or that the Company's accounting was in accordance with GAAP.

5.      Then, on February 27, 2014, the defendants disclosed that KBR's independent auditor had identified material weaknesses in the Company's internal controls over accounting. According to the auditor, KBR was not properly calculating cost estimates on the Company's long-term contracts.  Defendants' public statements, however, downplayed the problem and stated that the material weakness only involved one project that was near completion.  The defendants stated that in light of the material weakness, KBR's senior executives had conducted extensive testing on KBR's 2013 financial statements and "ensure[d]" that the reported results were accurate and in compliance with GAAP.

6.      Less than a week later, on March 4, 2014, the Company's Chief Accounting Officer, Dennis S. Baldwin ("Baldwin"), informed the Board that he was resigning.  Two days later, on March 6, 2014, before Baldwin's resignation was publicly disclosed, defendant William P. Utt ("Utt"), the Company's Chief Executive Officer ("CEO") and a longtime director, sold over 70% of his holdings of KBR stock for proceeds of over $4.5 million.  This stock sale was larger than all of defendant Utt's sales of KBR stock over the two previous years put together.

7.      On May 5, 2014, defendants disclosed that KBR's financial statements for the 2013 fiscal year should not be relied on and would be restated.  Due to errors in the estimates of costs to complete seven contracts in KBR's Services segment, the Company would be required to take a pre-tax charge of more than $150 million and the reversal of over $20 million in

previously recognized profits, with an additional negative cash flow impact of up to over $40 million.  Defendants also disclosed an overstatement of an additional $9 million in revenue and an understatement of income tax provision of approximately $6.5 million.

8.     The restated amounts are material: although KBR's annual revenues are in the billions, KBR's reported operating income (profits realized after operating expenses) for 2012 was only approximately $300 million and only $471 million in 2013.  The $150 million charge and additional over $40 million negative cash impact are equivalent to over 40% of the Company's $471 million operating income.

9.     Further, when the defendants announced the restatement on May 5, they claimed to identify all losses on the Canadian construction contracts through March 31, 2014.  However, in reality, during the first and second quarters of 2014, the Company incurred an additional $82 million in losses on these same contracts that had not yet been disclosed.

10.    Finally, on July 31, 2014, the Company's new Chief Financial Officer ("CFO") admitted the root cause of KBR's inability to accurately estimate the costs of the Canadian contracts: KBR did not have design drawings for the projects.  Without the drawings, the Company could not make the contract-cost estimates necessary for proper accounting.

11.    Plaintiff did not make a demand on KBR's Board prior to commencing this action.  Demand was excused because, as detailed below, in addition to being on notice of serious accounting problems that periodically recurred since at least 2009, a majority of the Board actually approved the Canadian contracts and therefore knew KBR did not have design drawings for them.  According to KBR's public disclosures, the Board "engages in risk oversight through the project approval process, whereby projects reaching a threshold level of expected revenues require Board approval."  The Canadian contracts were massive and key to KBR's

bottom line: in the second half of 2013, KBR failed to recognize $156 million in known losses on the Canadian contracts. During the first and second quarters of 2014, KBR incurred an additional $82 million in Canadian contract losses due to its failure to estimate costs properly. These losses, $238 million over the course of a year, were greater than the Company's net income during either 2012 or 2013. The Canadian contracts thus reached the level of expected revenues necessary to require Board approval, and they were approved by the Board. As a result, at all relevant times, the KBR's directors, having approved the contracts in question, *knew* that the Company could not reliably estimate costs for them because it lacked design drawings.

12.     The defendants, knowing this truth, declined to cause the Company's public disclosures to accurately reflect the state of KBR's business and the uncertainty in its outlook. The defendants pursued this course of action even though they were presented with red flags in 2012, 2013, and 2014 alerting them that KBR was not properly estimating contract costs. Knowing the Company lacked design drawings for large contracts which they had approved, KBR's directors allowed the scope of the problem to be concealed and issued repeated statements assuring investors that the Company's Canadian business was rock-solid and the key to the Company's success. As a result, demand was futile as to KBR's Board when this action was commenced.

13.     Further supporting Plaintiff's allegations that demand on KBR's Board was futile, on September 3, 2015, the U.S. District for the Southern District of Texas denied KBR's motion to dismiss the related securities class action arising out of the same facts as this action. *See Kohut, et al., v. KBR, Inc., et al.,* Case No. 4:14-cv-01287 (S.D. Tex) (ECF No. 76) (the "Securities Class Action"). In its opinion denying the motion to dismiss, the court held that scienter had been sufficiently pled because KBR and the individual defendants knew the

Canadian projects lacked design drawings, approved them anyway, and then concealed same even as the Company incrementally issued disclosures about its deficient internal controls and poor contract cost estimation processes. Despite these court findings, no action has been taken against the culpable directors and officers.

## JURISDICTION AND VENUE

14.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that this Complaint states a federal question: violations of Section 14(a) of the Securities Exchange Act of 1934. This Court has supplemental jurisdiction over the state law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to confer jurisdiction on a court of the United States which it would not otherwise have.

15.     Additionally, this Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 in that Plaintiff and defendants are citizens of different states and the amount in controversy exceeds $75,000 exclusive of interest and costs. Plaintiff is a citizen of New York, and no defendant is a citizen of that state.

16.     Venue is proper in this Court because KBR maintains executive offices in this District, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and the defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

### A.     Plaintiff

17.     At times relevant to the allegations herein, Plaintiff continuously held his shares of KBR and still does. Plaintiff is a citizen of New York.

### B.     Defendants

18. Nominal defendant KBR is a corporation incorporated under the laws of the State of Delaware, which maintains its principal executive offices at 601 Jefferson Street, Houston, Texas 77002. According to its public filings, KBR is a global engineering, construction, and services company. KBR's common stock trades on the New York Stock Exchange under the symbol "KBR."

19. Loren K. Carroll ("Carroll") is the Chairman of the Board and has served as a director of KBR since 2007. At relevant times, defendant Carroll was the Chairman of the Nominating and Corporate governance Committee and a member of the Compensation Committee. Upon information and belief, defendant Carroll is a citizen of California.

20. W. Frank Blount ("Blount") served as a director of KBR beginning in 2007 and was a director of KBR when this action was commenced. Defendant Blount did not stand for re-election at the 2015 annual meeting of KBR stockholders. At relevant times, defendant Blount was a member of the Nominating and Corporate Governance Committee and the Audit Committee. Upon information and belief, defendant Blount is a citizen of North Carolina.

21. Jeffrey E. Curtiss ("Curtiss") has served as a director of KBR since 2006. At relevant times, he was the Chairman of the Audit Committee and a member of the Nominating and Corporate Governance Committee. Upon information and belief, defendant Curtiss is a citizen of Texas.

22. Linda Z. Cook ("Cook") served as a director of KBR beginning in 2011 and was a director of KBR when this action was commenced. Defendant Cook retired from the Board effective January 20, 2015. At relevant times, defendant Cook was a member of the Corporate Social Responsibility Committee and the Compensation Committee. Upon information and belief, defendant Cook is a citizen of Texas.

23.     Lester L. Lyles ("Lyles") has served as a director of KBR since 2007.  At relevant times, defendant Lyles was a member of the Corporate Social Responsibility Committee and the Audit Committee.  Upon information and belief, defendant Curtiss is a citizen of Virginia.

24.     Jack B. Moore ("Moore") has served as a director of KBR since 2012.  At relevant times, defendant Moore was a member of the Audit Committee and the Corporate Social Responsibility Committee.  Upon information and belief, defendant Moore is a citizen of Texas.

25.     Richard J. Slater ("Slater") has served as a director since 2006.  At relevant times, defendant Slater was the Chairman of the Compensation Committee and a member of the Nominating and Corporate Governance Committee.  Upon information and belief, defendant Slater is a citizen of California.

26.     John R. Huff ("Huff") served as a director of KBR from 2007 until the annual meeting of stockholders in May 2014.  Defendant Huff was not a director when this action was commenced.  Upon information and belief, defendant Huff is a citizen of Texas.

27.     William P. Utt was the Chairman and Chief Executive Officer ("CEO") of KBR and a director since 2007.  Defendant Utt was not a director when this action was commenced. Defendant Utt did not stand for re-election at the annual meeting of stockholders in May 2014. He stepped down in June 2014 and was replaced by the Company's new CEO, Stuart Bradie ("Bradie").  Upon information and belief, defendant Utt is a citizen of Texas.

28.     The defendants referenced in ¶¶ 19-25 were the members of KBR's Board when this action was commenced and are collectively referred to herein as the "Director Defendants."

## DEFENDANTS' DUTIES

29.     By reason of their positions as officers, directors, and/or fiduciaries of KBR and because of their ability to control the business and corporate affairs of KBR at all relevant times,

defendants owed KBR and its stockholders fiduciary obligations of good faith, loyalty, and candor, and were required to use their utmost ability to control and manage KBR in a fair, just, honest, and equitable manner.  Defendants were required to act in furtherance of the best interests of KBR and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to KBR and its stockholders a fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

30.     Defendants, because of their positions of control and authority as directors and/or officers of KBR, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.  Because of their advisory, executive, managerial, and directorial positions with KBR, each of the defendants had knowledge of material non-public information regarding the Company.

31.     To discharge their duties, the officers and directors of KBR were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of KBR were required to, among other things:

> a.  Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;
>
> b.  Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority;
>
> c.  Exercise good faith to ensure that the Company's communications with

the public and with stockholders are made with due candor in a timely and complete fashion; and

d.   When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

32.    According to its charter,  the Audit Committee of KBR's Board is to provide oversight of:

> (1) the integrity of the financial statements of the Corporation, (2) the compliance by the Corporation with legal and regulatory requirements, (3) the independence, qualifications and performance of the Corporation's independent auditors and (4) the performance of the Corporation's internal audit function.

## SUBSTANTIVE ALLEGATIONS

Background

33.    During 2013, KBR's business prospects were highly dependent on the Canadian business in its Services segment.  Of particular importance were seven construction contracts related to "pipe fabrication and modular assembly projects" in Edmonton Alberta, Canada.  In these projects KBR was contracted to fabricate pipes and modular components and to provide turnaround services for oil and gas facilities in the Canadian oil sands.

34.    These Canadian contracts were so large that the losses the Company ultimately incurred during the second half of 2013 and first half of 2014 due to its failure to properly estimate costs were greater than KBR's net income for both 2012 and 2013.  The losses were $238 million, while KBR's net income in 2012 was $144 million and in 2013 was $229 million.

35.    These and similar construct contracts are part of KBR's Services business segment.  At relevant times, KBR operated in four business segments: (a) Hydrocarbons; (b) Infrastructure, Government & Power; (c) Services; and (d) "Other."  The Services segment provides    direct    hire    construction    and    construction    management,    fabrication,

operations/maintenance, commissioning/startup, and turnaround services. The Edmonton contracts were to fabricate pipe and assemble large, trailer-sized modules in KBR's Edmonton yard for transportation to remote locations in Alberta, where the modules would be fitted together to create large structures such as oil refineries.

36.     Because contracts like the Edmonton ones are essential KBR's core business, the Company has long disclosed, as in its 2012 Form10-K, that "[a]t least quarterly, significant projects are reviewed in detail by senior management" specifically in connection with cost estimates. To that end, as detailed below, KBR's Board engages in risk oversight in the area of project revenues. The Company's public disclosures state that "[a]t each meeting, the Board reviews aggregated KBR project revenues measured by type of contract – fixed or reimbursable – by country, client and project backlog." Further:

> *The Board also engages in risk oversight through the project approval process, whereby projects reaching a threshold level of expected revenues require Board approval …. In reviewing projects, the Board is presented with management's assessment of a particular project's cost exposure associated with operations risk, liabilities and funding risks, among others. In this manner, KBR's Board is engaged in risk oversight at the outset of the largest projects, which could have a material effect on KBR's operations.*

(Emphasis added.)

37.     As alleged in the related Securities Class Action, prior to approval of any large project, the Company would prepare a white-paper brief for senior management. *See Kohut, et al., v. KBR, Inc., et al.,* Case No. 4:14-cv-01287 (S.D. Tex) (ECF No. 60 at ¶¶ 60-61). The amended complaint in the Securities Class Action, which was sustained on motion to dismiss, describes that white-paper briefs would include cost estimates, an explanation of how they were created, risk evaluation, and they specifically would note the presence or absence of "design drawings." *Id.* This is because design drawings for a project are essential to the cost estimation

process. *Id.* at ¶ 61. According to the Securities Class Action complaint, under Company policy, entering a new construction contract without design drawings was viewed as a significant risk and required the approval of senior management. *Id.* at ¶ 62.

38.     As disclosed in public filings and supported by the allegations in the Securities Class Action, KBR's Board was involved in every stage of the approval and oversight of major contracts like the Canadian contracts. The Board permitted KBR representatives to repeatedly tell investors that the seven Canadian contracts were a core element of KBR's financial performance and highly profitable. Throughout 2013, the Board caused KBR to issue disclosures hyping the strong performance of the Canadian pipe fabrication business and its positive material effect on the Company's overall finances.

The 2012 Form 10-K

39.     On February 20, 2013, the Board caused KBR to file with the SEC its Form 10-K for its 2012 fiscal year (the "2012 10-K"). The 2012 10-K, which was signed by defendants Utt, Blount, Carroll, Cook, Curtiss, Huff, Lyles, Slater, and Moore, disclosed that KBR's 2012 consolidated operating income was $299 million, compared to $587 in 2011. This decrease was due in significant part to an $82 million decline in operating income from the Services segment. In particular, "[o]perating income from Services declined due to increased estimated costs to complete several U.S. construction fixed-price projects[.]" In 2012, the Company's total revenue was approximately $7.9 billion, of which $1.6 billion was derived from the Services segment. The Company's 2012 Services revenue increased by $43 million in 2012 as compared to 2011. The Form 10-K states "[t]his increase is primarily driven by increases of $167 million in our Canada product line and $121 million in our U.S. Construction product line." The increased activity in Canada was primarily related to the contracts for construction services for gas plants

in Northern British Columbia and fabrication modules for oil sands projects.

40.     The 2012 10-K also contains a section titled "Critical Accounting Policies" which, among other things, contained a subheading describing KBR's accounting for "Engineering and Construction Contracts."   This subheading states that KBR uses the percentage-of-completion method to account for contracts,[1] and "[a]t least quarterly, significant projects are reviewed in detail by senior management" specifically in connection with cost estimates.

The 2013 Fiscal Year

41.     On April 1, 2013, the SEC sent a comment letter to the Company in connection with the 2012 10-K requesting additional information regarding a wide variety of financial metrics.   The letter states in part: "Please expand your discussion to disclose the effects of any material revisions in contract estimates" and "[p]lease disclose the amount of pre-contract costs deferred, if material."

42.     On April 5, 2013, the Board caused KBR to file with the SEC its definitive proxy statement with the SEC in advance of the annual meeting of stockholders to be held May 16, 2013.   In the proxy statement, defendants Blount, Carroll, Cook, Curtiss, Moore, and Utt solicited stockholder votes for their own reelection.   The proxy statement states that each of KBR's incumbent directors "attended seventy-five percent or more of the aggregate of all meetings of the Board and of committees on which they served during the periods that they

---

[1]       Under GAAP, companies are normally required to account for revenues and losses on contracts using the "completed-contract" method.   Under the completed-contract method, "income is recognized only when a contract is completed or substantially completed." Accounting Standards Codification ("ASC") 605-35-25-88.   However, in certain circumstances GAAP permits companies to account for contracts using the "percentage-of-completion" method.   The percentage-of-completion method, by contrast, permits companies to recognize income as the work on a contract progresses, so long as the revenue and expected costs are recognized on a prorated basis.   ASC 605-35-82.

served during 2012." According to the proxy statement, defendant Carroll, as "Lead Director," worked closely with defendant Utt "and the Board on risk oversight and governance matters." As of April 2013, the members of the Audit Committee were defendants Blount, Lyles, and Moore. Curtiss was the Chairman. The proxy statement also states:

> KBR's Board of Directors considers risk oversight to be an integral part of its role, and *discussions regarding risks faced by the company are part of its meetings and deliberations throughout the year*. Furthermore, *at least twice each year, the entire Board receives a report from management regarding significant strategic, operational, financial, and hazard risks determined by management to have a potential significant impact on the company as a whole*. The risk report involves both current and emerging risks and is the culmination of a process involving input from all business units and executive leadership. The risk report includes specific strategic, operational, financial and hazard risks, the perceived trend for each of those specific risks — whether increasing, decreasing or stable — and the measures being taken to monitor and mitigate those risks.

> In addition to the enterprise risk management process described above, the Board of Directors also engages in *risk oversight in the area of project revenues*. At each meeting, the Board reviews aggregated KBR project revenues *measured by type of contract* — fixed-price or reimbursable — by country, client and project backlog. In this manner, the Board is informed of the overall risk profile of KBR's project revenues. *The Board also engages in risk oversight through the project approval process*, whereby projects reaching a threshold level of expected revenues require Board approval. Fixed-price contracts have a lower threshold level than reimbursable-type contracts because of their potential price and financial risks. *In reviewing projects, the Board is presented with management's assessment of a particular project's cost exposure associated with operations risk, liabilities and funding risks*, among others. In this manner, KBR's *Board is engaged in risk oversight at the outset of the largest projects, which could have a material effect on KBR's operations*.

> The Board is also engaged in risk oversight through regular reports from its Audit Committee. *The Audit Committee is charged with reviewing with management the company's major financial risk exposures*, as well as others areas of risk exposure if requested to do so by the Board, *and the steps management has taken to monitor and mitigate those exposures*. The Audit Committee receives periodic reports from management on these areas of potential exposure, including litigation, liquidity and capital resources, *financial reporting and disclosures*, regulatory and tax risks, among others. The Audit Committee also receives reports from management *regarding compliance risks* and Code of Business Conduct matters. The Audit Committee also reviews at least annually KBR's policies and guidelines that govern the process by which risk assessment and

enterprise risk management is undertaken. The Audit Committee also receives *in-depth* periodic reports from management regarding specific processes designed to monitor and manage risk, *such as project estimation procedures* and foreign exchange risk management. The Audit Committee conducts private sessions with KBR's Chief Financial Officer, Vice President of Internal Audit and General Counsel at each regular meeting and with KBR's independent auditors at each meeting prior to the release of quarterly and annual results. *The Audit Committee Chairman gives a report of the Audit Committee's activities to the full Board at each regular meeting* and in this manner the entire Board is informed of matters that the Audit Committee determines warrant full Board discussion.

(Emphasis added.)

43.     The proxy statement also describes the Company's clawback provision in cases of financial restatement:

[O]ur Performance Pay Plan (described in the section titled "B. Short-Term Incentives (Annual)") includes a clawback provision that allows the Compensation Committee to seek recovery of any short-term incentive award amounts determined to be an overpayment due to any restatement of our financial results that impact the performance metrics on which the short-term incentive awards were calculated. The Compensation Committee will adopt all clawback provisions required by the Dodd-Frank Act.

44.     On April 12, 2013, the Board caused KBR to file with the SEC its response to the SEC's April 1, 2013 comment letter in which it agreed to supplement its disclosures regarding the accounting for contract cost and estimates.  In the response, KBR stated that it intended to amend its disclosures regarding material revisions in contract estimates in the Company's upcoming Form 10-Q to state substantially the following:

During the quarter ended March 31, 2013, significant revisions to contract estimates had a $[TBD] million positive impact on the segment operating income of our Hydrocarbons business group as a result of revised project cost estimates on two of projects in our Gas Monetization business unit.

The Company also stated that it would make the following additional disclosure in the upcoming Form 10-Q regarding the amount of pre-contract costs deferred, if material:

Pre-contract costs incurred in anticipation of a specific contract award are deferred only if the costs can be directly associated with a specific anticipated

contract and their recoverability from that contract is probable. Pre-contract costs related to unsuccessful bids are written off no later than the period we are informed that we are not awarded the specific contract. Costs related to one-time activities such as introducing a new product or service, conducting business in a new territory, conducting business with a new class of customer or commencing new operations are expensed when incurred. We had no deferred pre-contract costs at March 31, 2013 and December 31, 2012.

45.     On April 25, 2013, the Board caused the Company to issue a press release announcing its first quarter 2013 results and filed its Form 10-Q for that period with the SEC. The press releases announced net income for the quarter was $88 million, or $0.59 per diluted share, slightly below the results from the same period of the previous year.  Operating income for the quarter was $133 million, compared to $112 million during the same period of 2012.  The press release discloses Services revenue was $485 million, up $137 million, or 39%, and services job income was $31 million, up $3 million, or 11%, "primarily related to several new module fabrication and turnaround projects ramping in Canada."  The Company's Form 10-Q for the quarter contains certifications by defendant Utt, stating that the Company's internal controls were effective.  The press release announcing the results also states:

> "KBR's first quarter performance was consistent with our expectations. We delivered $0.59 of EPS on strong project execution across all of KBR's businesses, including on the five problem projects we discussed in the fourth quarter where no incremental provisions were taken in the first quarter," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR.

*  *  *

> During the first quarter of 2013, KBR had share repurchases of $6 million, capital expenditures of $20 million and pension contributions of $7 million for total cash deployment of $33 million.

46.     The Company's Form 10-Q for the quarter also contains the following additional disclosures as requested by the SEC:

> During the quarter ended March 31, 2013, significant revisions to contract estimates had a $38 million positive impact on the segment operating income of our Hydrocarbons business group as a result of revised project estimates on two

16

of our projects in our Gas Monetization business unit.

\* \* \*

Pre-contract costs incurred in anticipation of a specific contract award are deferred only if the costs can be directly associated with a specific anticipated contract and their recoverability from that contract is probable. Pre-contract costs related to unsuccessful bids are written off no later than the period we are informed that we are not awarded the specific contract. Costs related to one-time activities such as introducing a new product or service, conducting business in a new territory, conducting business with a new class of customer or commencing new operations are expensed when incurred. We had no deferred pre-contract costs at March 31, 2013 and December 31, 2012

47.     Based on these representations and defendant Utt's statements during the quarterly investor conference call that the Company expected "continued robust performance from our Canadian operations in 2013," various analysts published reports projecting strong growth for KBR.  For example, analysts for William Blair stated "Canada is expected to be one of KBR's strongest growing divisions in 2013" and projected "greater expected earnings from services (driven foremost by strength in KBR's Canada unit) over the remainder of the year." Analysts from Sterne Agee reported that in light of the reported results and defendant Utt's statements, "Services business increased considerably as Canadian turnaround and fab[rication] projects showed no sign of a slowdown."

48.     On May 20, 2013, the Board caused KBR to file with the SEC a Form 8-K disclosing that as a result of the votes solicited at the annual meeting on May 16, 2013, defendants Blount, Carroll, Cook, Curtiss, Moore, and Utt were re-elected to the Board.

49.     On July 25, 2013, the Board caused KBR to issue a press release announcing its second quarter 2013 results and filed its Form 10-Q for that period with the SEC.  The press release announces net income for the quarter was $90 million, or $0.61 per diluted share, again slightly below the results from the same period of the previous year.  Operating income for the

quarter was $123 million, compared to $129 million during the same period of 2012.  The press release discloses Services revenue was $622 million, up $197 million, or 46%, and services job income was $38 million, up $9 million, or 31%, "primarily related to increased activity on several module fabrication and turnaround projects in Canada as well as increased work activity in Industrial Services and Building Group."  The Company's Form 10-Q for the quarter contains certifications by defendant Utt, stating that the Company's internal controls were effective.  The press release announcing the results also states:

> "KBR delivered solid project execution in the second quarter, driving job income and job income margins up 8% and 153 basis points year-over-year, respectively," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR. "We also made strong progress on bookings in North America, with key strategic wins in Downstream with nearly $1 billion in EPC awards in ammonia and ethylene, with the technology licenses awarded related to these downstream wins, and with a North American FEED award for the Pacific Northwest LNG project in Canada in our Gas Monetization business. These wins help to affirm KBR's position as a premiere North American contractor."

50.     The next day, during the Company's quarterly investor conference call, the Company's then-Chief Financial Officer, Susan K. Carter ("Carter"), repeated the false assertion that the Services segment's revenue was up 46% and stated this was due to "outstanding growth in Canada operations of 153%."   Defendant Utt stated that KBR's Canadian business had "doubled in size year-over-year."

51.     Various analysts again reacted positively to these statements, Deutsche Bank stating for example, that KBR had "strong business momentum" and "Canada remains one of KBR's strongest divisions and it, along with the building and industrial services units, is expected to continue driving services award opportunities over the balance of 2013."

52.     On September 26, 2013, the Company announced that Carter had resigned.

53.     On October 24, 2013, the Board caused KBR to issue a press release announcing its third quarter 2013 results and filed its Form 10-Q for that period with the SEC.  The press

release announces net income for the quarter was $24 million, or $0.16 per diluted share, down

from $81 million and $0.55, respectively, during the same quarter of the previous year.

Operating income for the quarter was $166 million, compared to an $11 million operating loss

during the same period of 2012.  The press release discloses Services revenue was $494 million,

up $75 million, or 18%, and services job income was $31 million, up $16 million, or 107%,

"primarily related to $21 million in charges in the third quarter of 2012 due to increased cost

estimates to complete two construction projects in the United States that did not recur in the third

quarter of 2013, as well as increased activity on several module fabrication projects in Canada."

The Company's Form 10-Q for the quarter contains certifications by defendant Utt, stating that

the Company's internal controls were effective.  The press release announcing the results also

states:

> "The third quarter was highlighted by a strong, 1.2x book-to-bill ratio and cash
> flow from operations of $178 million. The quarter was unfavorably impacted by
> the adverse tax ruling related to the separation from our prior parent, several non-
> operational discrete tax items and the delay of key project close-out items
> originally forecast in the quarter," said Bill Utt, Chairman, President, and Chief
> Executive Officer of KBR. "Looking forward, we continue to see a strong
> opportunity set of major projects across all of our businesses; however, we expect
> the near term competitive environment for new awards to continue."

> * * *

> KBR expects 2013 EPS to be at the low end of the previous guidance range of
> between $2.55 and $2.90, excluding charges related to the tax dispute with KBR's
> former parent.

54.    Analysts again highlighted the core role KBR's Canadian Services results were

playing in supporting the Company's revenues.  A report from Jefferies stated that although

KBR's quarter had been "messy," Services results "were very strong (BtB of 2.3x) driven by

higher activity levels in Canada and execution during the quarter was clean."

55.    On November 13, 2013, defendant Utt gave a presentation on behalf of KBR at

the Goldman Sachs 2013 Industrials Conference.  During the presentation, he stated that the Company's operations in Canada "have been very successful in construction fabrication turnarounds."

56.     On December 16, 2013, the Board caused the Company to announce that defendant Utt would retire from his role as Chairman, President, and CEO in 2014.  The press release states defendant Utt would continue in his current positions until a new CEO was appointed.  However, Utt did not stand for re-election as a director at the 2014 meeting of stockholders.  He continued in his role as President and CEO until June 2, 2014.

<u>2014 Fiscal Year</u>

57.     On February 27, 2014, the Board caused KBR to issue a press release announcing its fourth quarter and full year 2013 results and filed its Form 10-K for the year with the SEC. The press release announces net income for the quarter was $27 million, or $0.18 per diluted share, down slightly from the same quarter of the previous year.  Gross profit for the quarter was $84 million, compared to $60 million during the same period of 2012.  The press release discloses Services revenue for the quarter was $460 million, up $27 million and gross profit for Services was $10 million, up $ 62 million, "primarily due to $62 million in Q4 2012 charges related to cost increases to complete three construction projects in the United States in addition to increased activity on several module fabrication contracts in Canada."  The press release states the fourth quarter results included "a $20 million charge for increased costs from delays in project commissioning, project taxes, and other costs" for a project that was provisionally accepted in January 2014," after the period of the 2013 10-K.  The press release announcing the results also states:

> "The fourth quarter was highlighted by a strong 1.1x book-to-bill ratio and cash flow from operations of $209 million. We're also pleased our Board of Directors

has authorized a new $350 million share repurchase program," said Bill Utt, Chairman, President, and Chief Executive Officer of KBR. "However, earnings for the quarter were significantly less than anticipated."

* * *

Net income attributable to KBR was $229 million, or $1.54 per diluted share, in fiscal year 2013, compared with net income attributable to KBR of $144 million, or $0.97 per diluted share, in fiscal year 2012.

58.     Also on February 27, 2014, the Board caused KBR to file with the SEC its Form 10-K for the 2013 fiscal year (the "2013 10-K") with the SEC.  The Form 10-K, which was signed by defendants Utt, Blount, Carroll, Cook, Curtiss, Huff, Lyles, Slater, and Moore, discloses that it had concluded there was a material weakness in the operating effectiveness of its internal control over financial reporting.  However, the Form 10-K states that in light of the material weakness:

> [W]e performed additional analysis and other post-closing procedures to ensure our consolidated financial statements were prepared in accordance with generally accepted accounting principles and reflect its financial position and results of operations as of and for the year ended December 31, 2013. We identified that the known financial error was attributable to one major project that is near completion. As a result, notwithstanding the material weakness as described above, management concluded that the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position, results of operations and cash flows for the periods presented

* * *

> *Material weakness related to project reporting over the completeness and accuracy of estimates of revenues, costs and profit at completion for certain long-term construction projects with multiple currencies.* We determined that a material weakness in internal control over financial reporting existed since controls were not properly designed to determine that actual and estimated foreign currency effects were included in our estimates of revenues, costs and profit at completion for long-term construction contracts that contain multiple currencies. Additionally, our control to monitor the inclusion of foreign currency effects in our estimates of revenues, costs and profit at completion was not properly designed.

> These deficiencies gave rise to a reasonable possibility of a material misstatement

in the Company's annual or interim financial statements not being prevented or detected on a timely basis. This material weakness resulted in misstatements in the accounting for the foreign currency effects on long-term construction contracts which were corrected prior to issuance of the Company's December 31, 2013 Annual Report on Form 10-K.

* * *

In response to the material weakness we have developed a preliminary plan with the oversight of the Audit Committee of the Board of Directors to remediate the material weakness.

59.    The 2013 10-K discloses that revenues from the Company's business in Canada had increased from 3% in 2011, to 6% in 2012, to 10% in 2013, making the Canada business the third-largest geographic location for KBR by revenue.  KBR's 2013 operating income was $471 million, compared to $299 in 2012.  In 2013, the Company's total revenue was approximately $7.2 billion, of which $2.1 billion, an increase of 28%, or $451 million, was derived from the Services segment.  During 2013, the Services segment was KBR's second-highest revenue producing segment.  The Company's 2013 Services gross profit increased $106 million from 2012.  The Form 10-K states the Services revenue increase was "primarily driven by construction activities on oil sands-related projects in western Canada ....  We expect western Canada to remain a strong market for our construction services in 2014."

60.    The 2013 10-K, like that of the previous year, contains a section titled "Critical Accounting Policies" which, among other things, contained a subheading describing KBR's accounting for "Engineering and Construction Contracts."  This subheading states that the Company used the percentage-of-completion method to account for contracts and "[a]t least quarterly, significant projects are reviewed in detail by senior management," specifically in connection with cost estimates.

61.    On March 4, 2014, the Company's then-Chief Accounting Officer, Baldwin,

resigned but the Board did not publicly disclose this fact until March 10, 2014.

62.    In the interim, on March 6, 2014, defendant Utt sold 162,741 shares of KBR stock for over $4.5 million in cash.  Since at least 2007, defendant Utt had executed over thirty previous sales of KBR stock.  However, only two of these were sales of more than $500,000, and neither of those sales were of more than $750,000.  The 162,741 shares of KBR stock sold on March 6 by defendant Utt constituted more than 70% of his KBR holdings.

63.    On March 10, 2014, the Board caused KBR to publicly disclose the departure of Baldwin.

64.    On April 1, 2014, the Board caused KBR to file with the SEC its definitive proxy statement in advance of the annual meeting of stockholders to be held May 15, 2014.  In the proxy statement, defendants Blount, Carroll, Cook, Curtiss, Moore, Lyles, and Slater, solicited stockholders votes for: (i) their re-election; (ii) the ratification of KPMG, LLP as independent auditor; and (iii) an advisory vote on the named executive officer compensation.  In 2013 defendant Utt received a salary of $1.05 million and incentive compensation worth approximately $4.67 million.  The Company's other named executive officers received a total of $2.15 million in salary and incentive compensation worth approximately $14.91 million.

65.    The proxy statement, which incorporates by reference KBR's 2013 financial statements, discloses that each of KBR's incumbent directors "attended seventy-five percent or more of the aggregate of all meetings of the Board and of committees on which they served during the periods that they served during 2013."  According to the proxy statement, defendant Carroll, formerly Lead Director, began serving as the Chairman of the Board on March 31, 2014, as defendant Utt had decided not to stand for re-election as a director.  As of April 2013, the members of the Audit Committee were defendants Blount, Lyles, and Moore.  Curtiss was the

Chairman.  As it did in 2012, the KBR proxy statement also states:

> KBR's Board of Directors considers risk oversight to be an integral part of its role, and discussions regarding risks faced by the company are part of its meetings and deliberations throughout the year. Furthermore, at least twice each year, the entire Board receives a report from management regarding significant strategic, operational, financial, and hazard risks determined by management to have a potential significant impact on the company as a whole. The risk report involves both current and emerging risks and is the culmination of a process involving input from all business groups and executive leadership. The risk report includes specific strategic, operational, financial and hazard risks, the perceived trend for each of those specific risks — whether increasing, decreasing or stable — and the measures being taken to monitor and mitigate those risks.

> In addition to the enterprise risk management process described above, the Board of Directors also engages in risk oversight in the area of project revenues. At each meeting, the Board reviews aggregated KBR project revenues measured by type of contract — fixed-price or reimbursable — by country, client and project backlog. In this manner, the Board is informed of the overall risk profile of KBR's project revenues. The Board also engages in risk oversight through the project approval process, whereby projects reaching a threshold level of expected revenues require Board approval. Fixed-price contracts have a lower threshold level than reimbursable-type contracts because of their potential price and financial risks. In reviewing projects, the Board is presented with management's assessment of a particular project's cost exposure associated with operations risk, liabilities and funding risks, among others. In this manner, KBR's Board is engaged in risk oversight at the outset of the largest projects, which could have a material effect on KBR's operations.

> The Board is also engaged in risk oversight through regular reports from its Audit Committee. The Audit Committee is charged with reviewing with management the company's major financial risk exposures, as well as others areas of risk exposure if requested to do so by the Board, and the steps management has taken to monitor and mitigate those exposures. The Audit Committee receives periodic reports from management on these areas of potential exposure, including litigation, liquidity and capital resources, financial reporting and disclosures, regulatory and tax risks, among others. The Audit Committee also receives reports from management regarding compliance risks and Code of Business Conduct matters. The Audit Committee also reviews at least annually KBR's policies and guidelines that govern the process by which risk assessment and enterprise risk management is undertaken. The Audit Committee also receives in-depth periodic reports from management regarding specific processes designed to monitor and manage risk, such as project estimation procedures and foreign exchange risk management. The Audit Committee conducts private sessions with KBR's Chief Financial Officer, Vice President of Internal Audit and General Counsel at each regular meeting and with KBR's independent auditors at each

meeting prior to the release of quarterly and annual results. The Audit Committee Chairman gives a report of the Audit Committee's activities to the full Board at each regular meeting and in this manner the entire Board is informed of matters that the Audit Committee determines warrant full Board discussion.

66.     The proxy statement further describes the Company's clawback provision in cases of restatement:

> Performance Pay Plan (described in the section titled "Short-Term Incentives (Annual)") includes a clawback provision that allows the Compensation Committee to seek recovery of any short-term incentive award amounts determined to be an overpayment due to any restatement of our financial results that impact the performance metrics on which the short-term incentive awards were calculated. The Compensation Committee will adopt all clawback provisions required by the Dodd-Frank Act.

67.     On April 9, 2014, the Board caused the Company to announce that defendant Utt had resigned and Stuart Bradie ("Bradie") had been named President and Chief Executive Officer of KBR, effective June 2, 2014. The press release states Bradie would become a director when he joined the Company. According to KBR's subsequent public filings, defendant Utt was compensated approximately $1.7 million between January 1, 2014 and his resignation on April 9, 2014.

## THE TRUTH BEGINS TO EMERGE

68.     On May 5, 2014, the Board caused KBR to issue a press release announcing that it would restate its financial statements for the year 2013. The press release states that the Company would be forced to take "pre-tax charges of $158 million, consisting of the reversal of $23 million previously recognized pre-tax profits and the recognition of approximately $135 million in pre-tax estimated losses at completion" and KBR forecasted additional negative cash flow impact of "less than $45 million." In particular, the press release states:

> *In connection with the preparation of KBR's Form 10-Q for the three months ending March 31, 2014, we determined that the estimated costs to complete seven Canadian pipe fabrication and module assembly contracts within our Services*

25

*business segment that were awarded during 2012-2013 will result in pre-tax charges of $158 million, consisting of the reversal of $23 million in previously recognized pre-tax profits and the recognition of approximately $135 million in pre-tax estimated losses at completion.* The negative cash impact associated with the work released to date under the seven contracts has largely been incurred and the forecast net negative cash flow to complete this work is expected to be less than $45 million. Our review of this matter is ongoing and therefore the amounts previously noted are subject to change. *We believe that the majority of these losses should have been recognized in our consolidated financial statements for the year ended December 31, 2013.*

The seven contracts in question are with third-party clients and do not impact other KBR projects. Six of the contracts will be completed during 2014 or in early 2015. The seventh contract is a master services-type agreement that provides our client with the right, but not the obligation, to place new pipe fabrication and module assembly orders until 2017. *The pre-tax losses noted above include estimated losses only for work released to us through March 31*, 2014. Future work orders, if any, will be accounted for at the time of each release. We have begun discussions with our client under the master services agreement regarding a market-based cost adjustment. At this time, we can provide no assurance that such discussions will be successfully concluded. The estimated losses noted above do not assume recovery from clients for quantity and/or cost increases caused by client-directed actions. We believe we are entitled to certain recoveries from our clients but since collection remains uncertain, we will record any such recoveries if, and when, mutually agreed.

KBR's self-perform pipe fabrication and module assembly activities are limited to our Edmonton, Alberta operations. The contracts referenced herein were part of a rapid expansion of work at these operations and resulted in increased internal and external costs and adversely impacted our historical module assembly productivity rates.

*Separately, during the preparation of our Form 10-Q for the three months ending March 31, 2014, we identified an overstatement error in our revenue recognition on a long-term construction project approximating $9.0 million pre-tax ($6.3 million after tax) and an error which resulted in an understatement of our income tax provision of approximately $6.5 million that had not been properly included in the Consolidated Statement of Income for the year ended December 31, 2013.*

(Emphasis added.)

69.     The accompanying Form 8-K also discloses that the restatement had triggered a

default in certain of the Company's credit covenants:

On December 2, 2011, KBR, Inc. ("KBR") entered into a $1 billion, five-year

unsecured revolving credit agreement with a syndicate of international banks. Pursuant to the terms of that credit agreement, it is an event of default if any certificate furnished to the bank syndicate is incorrect or proves to have been incorrect, when made or deemed made. As described in Item 4.02 below, it has been determined that KBR's previously issued consolidated financial statements as of and for the year ended December 31, 2013 should no longer be relied upon. We do not currently expect that the corrections to our 2013 consolidated financial results, and any impact to our March 31, 2014 results, will cause a financial covenant breach under our credit agreement; however, the management certifications we made to our financial institutions under the credit agreement are no longer valid. Without further agreement from our bank syndicate, KBR is prohibited from requesting the issuance of any new letters of credit or loan advances under its committed and uncommitted lines of credit, which could materially impact its business operations and liquidity. Under certain circumstances, KBR may also be required to provide cash collateral to secure outstanding letters of credit or surety bond positions. As of April 30, 2014, KBR estimates that it had outstanding letters of credit of approximately $632 million as well as consolidated cash and equivalents of approximately $900 million. We are currently in discussions with our bank syndicate to reach an amicable resolution of this matter.

\* \* \*

As a result of the errors described above, on May 1, 2014, the Audit Committee of the Board of Directors of KBR, in consultation with and based on the recommendation of management, concluded that KBR's consolidated financial statements as of and for the year ended December 31, 2013 should be restated to correct for the aforementioned errors and that, accordingly, KBR's previously issued consolidated financial statements for 2013 should no longer be relied upon. Additionally, KBR's earnings and press releases and similar communications should no longer be relied upon to the extent that they relate to these consolidated financial statements. As soon as practicable, we expect to amend KBR's Form 10-K for the year ended December 31, 2013 to restate the financial statements and correct the errors identified herein, and to revise related information, including our discussion of KBR's internal controls and procedures. As a result, we will not file KBR's 10-Q for the three months ending March 31, 2014 until after filing of the amended Form 10-K. Given the ongoing nature of our review, the forecast filing date for the amended 2013 Form 10-K and Form 10-Q for the three months ending March 31, 2014 is uncertain. KBR's management is continuing to review these matters to ensure it has determined the causes for these errors and will continue to consider the effect of these errors on our prior conclusions regarding our internal control over financial reporting and disclosure controls and procedures as of the end of the applicable period. We will amend, as necessary, any disclosures pertaining to our evaluation of such controls and procedures in connection with our amended Annual Report on Form 10-K for the year ended December 31, 2013, and in our Form 10-Q for the three months ending March 31,

2014.

* * *

The KBR Audit Committee, comprised of members of its Board of Directors, has retained independent legal and accounting advisors to review these matters and to advise the Committee, which is in addition to the review being conducted by KBR's management. The Audit Committee has discussed the matters described in this Current Report with KPMG LLP, KBR's independent registered public accounting firm.

As a result of the above items, KBR is also withdrawing its previously issued guidance for 2014. We expect to provide updated guidance later this year. In keeping with our previously announced intent to return capital to shareholders, between February 27, 2014 and April 30, 2014, KBR repurchased approximately 3.4 million shares of its common stock at an average price of $27.29 for a total of $94 million.

70.     On May 6, 2014, UBS downgraded KBR stock from Buy to Neutral and lowered the price target more than 20% from $33 per share to $26 per share on concerns about earnings visibility through 2014.   The UBS report mentioned the contract issues disclosed in the restatement as a reason for the downgrade and stated that a further downside could exist.

71.     On May 13, 2014, the Board caused KBR to file with the SEC a Form 8-K disclosing it had obtained a waiver for its violation of covenants for certain credit agreements:

On May 9, 2014, KBR, Inc. ("KBR") received a Waiver under its Five Year Revolving Credit Agreement dated as of December 2, 2011 (the "Credit Agreement"), providing for the waiver of compliance with certain representations, warranties and covenants of the Credit Agreement.  The Waiver relates to certain defaults that were triggered, or might have been triggered, arising from KBR's previously announced restatement of its December 31, 2013 financial statements, and from the timing and delivery of financial statements for the three months ended March 31, 2014, and related documents, due to delays caused by the pending restatement, as described in KBR's Current Report on Form 8-K filed with the Securities and Exchange Commission on May 5, 2014.  Together, the Waiver and the Credit Agreement require that KBR deliver its amended Form 10-K for the year ended December 31, 2013, its Form 10-Q for the three months ending March 31, 2014, and Form 10-Q for the three months ended June 30, 2014, and related certificates by August 30, 2014.  After giving effect to the Waiver, no event of default exists under the Credit Agreement as a result of the previously announced restatement, and KBR may request the issuance of new

letters of credit and loan advances under the Credit Agreement in accordance with its terms. The Waiver is filed as Exhibit 10.1 to this Form 8-K.

72.    Also on May 13, 2014, the Board caused KBR to file with the SEC an acknowledgment of its inability to timely file its quarterly report for the quarter ended March 31, 2014.   The disclosure also revealed that "[t]he Securities and Exchange Commission has informed KBR that it has opened an investigation with respect to the material weaknesses to KBR's internal controls and the restatement."

73.    On May 20, 2014, the Board caused KBR to file with the SEC a Form 8-K disclosing the results of the stockholder vote at the annual meeting: (i) defendants Blount, Carroll, Cook, Curtiss, Lyles, Moore, and Slater were all reelected; (ii) ratification of the independent auditor was approved, and (iii) the advisory vote on executive compensation approved the Company's compensation plan as disclosed in the proxy.

74.    On May 30, 2014, the Board caused KBR to file with the SEC its restated Annual Report for the 2013 fiscal year on Form 10-K/A.   The restatement made changes to KBR's previously reported revenues, cost of revenues, gross profit, general and administrative expenses, operating income, income before income taxes and noncontrolling interests, provision for income taxes, net income, net income attributable to noncontrolling interests, net income attributable to KBR, basic EPS, and diluted EPS.   The Form 10-K/A states in part:

> The restatement was determined to be necessary *due to the materiality of the additional estimated costs* to complete seven Canadian pipe fabrication and modular assembly contracts within our Services business segment. The additional estimated costs to complete resulted in pre-tax charges for $156 million in 2013, consisting of the reversal of $24 million in previously recognized pre-tax profits and the recognition of $132 million in pre-tax losses at completion. The tax impact of this adjustment was $10 million.

(Emphasis added.)

75.    As further stated in the 2013 Annual Report, the scale of the restatement

demonstrates that KBR's previous statements regarding the scope of deficient internal controls

had vastly understated the problem:

> We determined that a material weakness in internal control over financial reporting existed in our Canadian pipe fabrication and modular assembly business within our Services business segment *resulting from the Company having insufficiently trained project managers, project controls, accounting and executive management professionals* to perform project oversight reviews and monitor compliance with the Company's standard processes and controls. Furthermore, *the control environment was ineffective in that the culture at the Canadian pipe fabrication and modular assembly business facilitated delayed identification and communication of project concerns and the proper preparation of complete and accurate estimates of revenues, costs and profit at completion.* As a result, our controls over the completeness and accuracy of information used in our preparation of estimates and our control procedures over our preparation of estimates to complete and our controls over the reviews of such estimates to complete for our Canadian pipe fabrication and modular assembly business also were not affective.

> * * *

> In response to this material weakness we have developed a plan with the oversight of the Audit Committee of the Board of Directors to remediate this material weakness. Currently, our plan to remediate this material weakness during fiscal year 2014 in our Canada pipe fabrication and modular assembly business includes:

> •      Conduct town hall meetings throughout the Company's worldwide organization led by executive management to provide encouragement for employees to follow the Company's corporate culture and policies and procedures.

> •      Change certain management and increase the number of qualified professionals[.]

> •      Provide training to new and key personnel on roles and responsibilities, including line of communications in the event of concerns.

> •      Provide training to new and key personnel on Company standard processes and systems across all project operations, oversight and support functions, including project management and module yard management.

> •      Implement and monitor execution of KBR standard project controls work processes and systems across the Canada pipe fabrication and modular assembly projects.

- Implement standard project management oversight from corporate management.

(Emphasis added.)

76.     Although the Board stated in the Form 10-K/A that it had fully investigated the material weaknesses to its internal controls over financial reporting, identified the problems, and accounted for their impact on KBR's bottom-line, this was not the case.

77.     On June 19, 2014, the Board caused KBR to announce its first quarter 2014 financial results and disclosed "[o]verall results were disappointing and were negatively impacted by losses stemming from our Service segment's pipe fabrication and module assembly facility in Canada …."  This consisted of "$41 million of additional losses in the first quarter of 2014 taken on the Company's pipe fabrication and module assembly projects in Canada."

78.     On July 31, 2014, the Board caused KBR announce its second quarter 2014 results.  Yet again, the Board disclosed that the harm inflicted on the Canadian Services business was lasting: "Gross profit was a loss of $40 million, down $60 million, primarily due to lower work volumes on North American Construction projects and $41 million in increased construction labor costs forecast to complete several problem Canadian pipe fabrication and module assembly projects."

79.     On the same day, defendants conducted KBR's quarterly earnings conference call to discuss the results with analysts and investors.   During the call, Brian K. Ferraioli ("Ferraioli"), Chief Financial Officer and Executive Vice President, stated the following in part:

> T]he quarter's results were again dominated by Canadian projects, particularly the pipe fabrication and module assembly contracts …. These contracts represented significant sales growth, but the modules that we are manufacturing and assembling are far larger and more complex than we had historically completed …. The cost increased and productivity decreased and that's what's driving the financial results.

…The 3 projects that remain are tied to unit rates based on weight of the modules and therefore, any increased welding or other assembly work that is required when we receive the drawing from our clients, increases our cost but it doesn't allow us to increase the revenues because the weight, in many cases, did not change. And that's what's driving the $41 million estimate to complete the additional 3 modules that you see here.

80.    Later during the same call, when asked to provide more detail regarding the Company's losses in Canada and explain why analysts "should have any conviction that [KBR is] now conservative enough" with its accounting, Mr. Ferraioli stated:

On the remaining contracts, the majority of the drawings have now been received from the clients and therefore, we're able to do the take offs to understand exactly what the scope of work is. So when the quantity of work increases based upon drawings, that's what's driving the results for this quarter. So *it was really impossible for anyone to be able to predict what the scope of work will be when you don't have the drawings that are issued for construction in-house*. So as we get to the back-end of these projects, the drawings are in and now we have defined the scope and therefore we're much better suited to be able to estimate what those costs are to complete.

(Emphasis added.)

81.    The reaction to Ferraioli's admission that defendants had not had access to the design drawings for the some or all of the Canadian contracts, and thus was unable to reasonably estimate project costs and should not have been using use the percentage-of-completion method of accounting, was swift.  A research report from Macquarie titled "In The Penalty Box On Canadian Charges" stated the "loss was driven primarily by a US$41m increase in construction labor costs forecast to complete several problem Canadian pipe fabrication and module assembly projects – the same projects that caused issues for the company last quarter."

## DAMAGES TO THE COMPANY

82.    KBR has been, and will continue to be, severely damaged and injured by defendants' misconduct.  As a direct and proximate result of the defendants' conduct, KBR has

been seriously harmed and will continue to be.  Such harm includes, but is not limited to:

    a.   costs incurred in compensation and benefits paid to defendants that breached their duties to the Company;

    b.   costs due to increased cost of credit related to the renegotiation of the Company's credit facilities after breaching loan covenants;

    c.   costs incurred due to the Company's buy-back of KBR common stock at inflated share prices;

    d.   costs incurred due to the retention of financial advisors and legal counsel in order to assess the scale of the restatement and to restate the financial results;

    e.   substantial loss of market capital;

    f.   costs already incurred and to be incurred defending the pending securities fraud class actions;

    g.   costs incurred responding to the pending SEC investigation; and

    h.   any fines that are a result of the Company's violations federal and state law.

83.    In addition, KBR's business, goodwill, and reputation with its business partners, regulators, and stockholders have been gravely impaired.  The credibility and motives of management are now in serious doubt.

84.    The wrongdoing complained of herein has irreparably damaged KBR's corporate image and goodwill.  For at least the foreseeable future, KBR will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that KBR's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

85.     Plaintiff brings this action derivatively in the right and for the benefit of KBR to redress injuries suffered, and to be suffered, by KBR as a direct result of breaches of fiduciary duty by the individual defendants.  KBR is named as a nominal defendant solely in a derivative capacity.  This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

86.     When this action was commenced, the Board of KBR consisted of the following seven Director Defendants: Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater.  Plaintiff has not made any demand on the Board to institute this action because a pre-suit demand on the KBR Board would be futile, and therefore, excused.  This is because despite knowing that the Company could not accurately estimate the costs of major contracts, the Director Defendants concealed this fact from the public, declined to institute functioning internal controls, and then permitted the Company to issue misleading and untruthful disclosures.  By participating in this course of conduct, the Director Defendants exposed the Company to damage and injury.  Consequently, the Director Defendants face a substantial risk of liability for breaches of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand.  Thus, demand on the Board is futile, and therefore excused.

**Demand Is Excused Because A Majority Of The Director Defendants Face A Substantial Likelihood Of Liability Based Upon Their Actions**

*Defendants Blount, Curtiss, Lyles, and Moore Were Active Participants Of The Audit Committee*

87.     Defendants Blount, Curtiss, Lyles, and Moore, a majority of the Director Defendants, were the members of KBR's Audit Committee.  According to its charter, the Audit Committee's primary responsibility is oversight of "the integrity of the financial statements of the Corporation," "the compliance by the Corporation with legal and regulatory requirements,"

and "the performance of the Corporation's internal audit function."

88.     According to the Company's most recent two proxy statements excerpted above, the Audit Committee was charged with reviewing with management, the company's major financial risk exposures and the steps being taken to monitor and mitigate such exposures.  The Audit Committee received reports from management regarding areas potential exposure such as litigation, financial reporting, and disclosure.  The 2014 proxy statement states the Audit Committee "receives in-depth periodic reports from management regarding specific process designed to monitor and manage risk, *such as project estimation procedures*…."  (Emphasis added.)  The Audit Committee further conducted private sessions with KBR's Chief Financial Officer and Vice President of Internal Audit "at each meeting prior to the release of quarterly and annual results."  According to these four defendants themselves, as stated in the 2013 Audit Committee Report included in the 2013 proxy statement, during the 2013 fiscal year, the Audit Committee reviewed and discussed with management and the Company's independent auditor reports on internal controls over financial reporting and the adequacy and effectiveness of the Company's disclosure controls and procedures, reviewed and discussed with management major financial risk exposures, and "recommended to the Board of Directors that the audited financial statements be included in KBR's Annual Report on Form 10-K for the fiscal year ended December 31, 2013, for filing with the SEC."

89.     The KBR Audit Committee met six times during 2013 and eleven times in 2014. As a result of these meetings, the Audit Committee's regular updates with management and detailed review of risk issues, and generally due to their service as directors of KBR, defendants Blount, Curtiss, Lyles, and Moore knew:

        a.   The estimation of contract costs was a fundamental element of KBR's ability

to accurately account for its business;

b.  In order to comply with GAAP, KBR was required to comply with specific rules regarding how to account for contract costs;

c.  As stated in the Company's public disclosures repeatedly, KBR's Canadian pipe fabrication contracts were key to the Company's financial performance;

d.  In 2012, KBR's operating income dropped nearly 50% due in significant part to previously over-estimated contract costs for U.S. construction projects;

e.  The Company's cost estimates for construction contracts are sufficiently material to the Company's business that the Company's 2012 and 2013 Forms 10-K specifically contained a description of them under "Critical Accounting Policies" and stated that cost estimates for significant projects are reviewed "in detail" by senior management "at least quarterly";

f.  After filing the 2012 Form 10-K, the SEC specifically requested enhanced disclosure regarding the estimation of contract costs;

g.  In response to the SEC's request, the Company inserted new disclosures describing the estimation of contract costs into KBR's Form 10-Q filed April 25, 2013;

h.  In September 2013, the Company's CFO, Carter, resigned and was replaced by the new CFO Ferraioli, both of whom defendants Blount, Curtiss, Lyles, and Moore worked closely with, according to the Company's public disclosures;

i.  In October 2013, the Company disclosed $21 million in charges during the third quarter of 2013 due to increased contract cost estimates;

  j. In February 2014, the KBR was forced to disclose the existence of material weaknesses in its internal controls over financial disclosure and, due to same, senior management had conducted a detailed review of KBR's financial results;

  k. Also in February 2014, KBR's 2013 Form 10-K disclosed $62 million in charges that resulted in an operating income decline for the year in the Services segment related to contract cost underestimation; and

  l. The Company could not accurately estimate the costs of the Canadian contracts because it lacked design drawings.

  90. Due to the foregoing facts, defendants Blount, Curtiss, Lyles, and Moore, were aware: (a) the estimation of contract costs was a material element to the Company's financial statements and forecasts; and (b) improper estimation of contract costs was in violation of GAAP and presented a serious financial risk to KBR.

  91. In light of the foregoing torrent of red flags, and in the absence of information to suggest that the Audit Committee did not engage in the regular review of risks and consultation with senior management that it claimed to, these four defendants knew or consciously declined to learn that KBR's internal controls were deficient in that they were not ensuring the Company's accounting for contract costs conformed with GAAP.  These four defendants knew or consciously declined to learn that the internal controls deficiencies presented a serious financial risk to KBR, and they declined to fix them or halt statements that they knew, or but for the exercise of reasonable diligence should have known, were inaccurate and misleading.  Due to their breach of their duties, any demand upon defendants Blount, Curtiss, Lyles, and Moore is futile.

*The Entire Board Knew KBR Was Unable To Accurately Estimate Contract Costs And*
*Nonetheless Failed To Assure Truthful Representations Or Repair Deficient Internal Controls*

92.     Each of the Director Defendants, Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater, were members of the Board since prior to 2013 fiscal year.  As alleged above, these defendants were required to, and did, approve the Canadian contracts knowing that the Company lacked design drawings for them.  As a result, Director Defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater knew that the Company could not accurately forecast costs for the Canadian contracts.  These defendants also knew that statements made by defendant Utt and others praising the performance of the Canadian contracts were not verifiable due to the lack of design drawings.  When, beginning in 2013, these defendants were presented with repeated indications that KBR's cost estimation processes and controls for major contracts were not functioning, they did not require the Company to truthfully disclose the lack of design drawings or to reveal that the problems with cost estimation were pervasive.

93.     According to the Company's most recent two proxy statements excerpted above, "KBR's Board of Directors considers risk oversight to be an integral part of its role, and discussions regarding risks faced by the company are part of its meetings and deliberations throughout the year."  Twice each year, defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater each received a report from management regarding significant strategic, operational, financial, and hazard risks.  This risk report included specific risks and the measures being taken to monitor and mitigate those risks.

94.     In addition, according to the 2013 proxy statement, defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater engaged in risk oversight specifically in the area of "projected revenues."  "At each meeting, the Board reviews aggregated KBR project revenues measured by type of contract … by country, client and project backlog.  In this manner, the

Board is informed of the overall risk profile of KBR's project revenues."  Defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater also were engaged in a project approval process whereby they reviewed projects expected to result in material revenue.  KBR's proxy statements state that defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater were "engaged in risk oversight at the outset of the largest projects, which could have a material effect on KBR's operations."  Finally, the Audit Committee gave a report on its activities "to the full Board at each regular meeting and in this manner the entire Board is informed of matters that the Audit Committee determines warrant full Board discussion."

95.    Defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater met without management seven times in 2013 and six times in 2014, and more times in the presence of management.   As a result of these meetings and their oversight duties described above, defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater knew:

      a.  The estimation of contract costs was a fundamental element of KBR's ability to accurately account for its business;

      b.  In order to comply with GAAP, KBR was required to comply with specific rules regarding how to account for contract costs;

      c.  As stated in the Company's public disclosures repeatedly, KBR's Canadian pipe fabrication contracts were key to the Company's financial performance;

      d.  In 2012, KBR's operating income dropped nearly 50% due in significant part to previously over-estimated contract costs for U.S. construction projects;

      e.  The Company's cost estimates for construction contracts are sufficiently material to the Company's business that the Company's 2012 and 2013 Forms 10-K specifically contained a description of them under "Critical Accounting

Policies" and stated that cost estimates for significant projects are reviewed "in detail" by senior management "at least quarterly";

f.   After filing the 2012 Form 10-K, the SEC specifically requested enhanced disclosure regarding the estimation of contract costs;

g.   In response to the SEC's request, the Company inserted new disclosures describing the estimation of contract costs into KBR's Form 10-Q filed April 25, 2013;

h.   In September 2013, the Company's CFO, Carter, resigned and was replaced by the new CFO, Ferraioli, both of whom defendants Blount, Curtiss, Lyles, and Moore worked closely with, according to the Company's public disclosures;

i.   In October 2013, the Company disclosed $21 million in charges during the third quarter of 2013 due to increased contract cost estimates;

j.   In February 2014, the KBR was forced to disclose the existence of material weaknesses in its internal controls over financial disclosure and, due to same, senior management had conducted a detailed review of KBR's financial results;

k.   Also in February 2014, KBR's 2013 Form 10-K disclosed $62 million in charges that resulted in an operating income decline for the year in the Services segment related to contract cost underestimation; and

l.   The Company could not accurately estimate the costs of the Canadian contracts because it lacked design drawings.

96.   In addition to the foregoing, actual knowledge of KBR's deficient internal

controls and misleading financial statements can be inferred as to defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater because: (a) the Canadian contracts at issue were the most important element of KBR's reported profits at relevant times; (b) the accounting rules KBR violated were in place for decades and KBR expressly, repeatedly stated that these rules were "fundamental to" its financial results; (c) the magnitude of the overstatements was enormous, for example, in the third and fourth quarters of 2013, KBR overstated its net income by *329%* and *242%*, respectively, and KBR's 2013 net income was artificially inflated by over *60%*; (d) assuming the procedures described in the proxy statements were followed, after management conducted its detailed review of the material weaknesses disclosed in February 2014, the Board was updated as to the specific nature of the problems; (e) the Board conducted supervision of major projects and, as was later admitted, the Canadian contracts in question *lacked* design drawings; and (f) as a result, the misleading accounting and pervasively deficient internal controls would have been obvious to anyone who cared to look, which according to the Company's public filings, the Board did do on a regular basis.

97.     Due to the foregoing facts, defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater were aware of: (a) the estimation of contract costs was a material element to the Company's financial statements and forecasts; and (b) improper estimation of contract costs presented a serious financial risk to KBR.

98.     In light of this torrent of red flags, and in the absence of information to suggest that the Board did not engage in its regular review of risks and consultation with senior management, these seven defendants knew or consciously declined to learn that KBR's internal controls were deficient in that they were not ensuring the Company's accounting for contract costs conformed with GAAP.  These seven defendants knew or consciously declined to learn that

the internal controls deficiencies presented a serious financial risk to KBR, and they declined to fix them or halt statements that they knew, or but for the exercise of reasonable diligence should have known, were inaccurate and misleading.  Due to their breach of their fiduciary duties, any demand upon defendants Blount, Carroll, Curtiss, Cook, Lyles, Moore, and Slater is futile.

*Demand Is Excused As To The Pre-2009 Directors, Defendants Blount, Carroll, Curtiss, Lyles, and Slater*

99.     Defendants Blount, Carroll, Curtiss, Lyles, and Slater, a majority of the Director Defendants, have served on the Board since at least 2007.  In 2009, while defendants Blount, Carroll, Curtiss, Lyles, and Slater were members of the Board, KBR was criminally charged by the U.S. Department of Justice ("DOJ") and was the target of an enforcement action filed in this Court by the SEC in connection with violations of the Foreign Corrupt Practices Act ("FCPA").  KBR pled guilty in the U.S. District Court for the Southern District of Texas to criminal charges of conspiring to violate the FCPA and violating the FCPA.  Pursuant to the guilty plea, the Company was jointly and severally liable for a criminal penalty of $402 million, of which KBR ultimately paid $20 million.  Also in 2009, the Company settled a civil enforcement action by the SEC under which KBR was jointly and severally liable for a penalty of $177 million, all of which was paid by co-defendants.  In settling the SEC action, the Company agreed to a three-year period of organizational probation and a permanent injunction.

100.     The 2009 FCPA problems are relevant hereto because a central allegation of the SEC's complaint was that the Company accomplished its multi-year bribery scheme by false accounting that occurred because KBR's deficient internal controls failed to assure, among other things, that accounting entries were made in accordance with GAAP: "numerous KBR … company records" "falsely characterized" bribes paid to Nigerian officials.  The SEC complaint alleged that KBR violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act regarding

company records and internal controls, as well as section 13(b)(5) of the Exchange Act regarding the falsification of books and records, 15 U.S.C §§ 78m(b)(5), 78m(b)(2)(A) and 78m(b)(2)(B), respectively.  *See SEC v. KBR*, *Inc.*, *et al.,* C.A. No. 4:09-cv-00399, (S.D. Tex) (ECF Doc. No. 1), filed February 11, 2009.  In particular: (a) Section 13(b)(2)(A) of the Exchange Act requires companies to keep accurate books, records, and accounts which fairly reflect the transactions entered into; and (b) Section 13(b)(2)(B) requires companies to devise and maintain a system of internal controls sufficient to provide reasonable assurances that transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

101.    In order to resolve the SEC's claims, Blount, Carroll, Curtiss, Lyles, and Slater consented to the Final Judgment permanently enjoining KBR against the violations of sections 13(b)(5), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act.  *See SEC v. KBR, Inc.* (ECF No. 6), filed February 11, 2009.  Attached to the executed final judgment was a Certificate of Corporate Resolution containing a resolution adopted by KBR on February 6, 2009, permitting the Company's general counsel to approve the Company's consent to the final judgment.  By adopting the February 6, 2009 resolution, defendants Blount, Carroll, Curtiss, Lyles, and Slater were on actual notice of the content of the final judgment.

102.    Further, the final judgment itself expressly applied to defendants Blount, Carroll, Curtiss, Lyles, and Slater: "KBR's officers, agents, servants, employees, attorneys, and all persons in active concert or participation with them who receive actual notice of this Final Judgment … are permanently restrained and enjoined from violation, directly or indirectly" sections 13(b)(5), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act.

103.    However, these five defendants, knowing the harm those inadequate internal controls had wrought on the Company and having been on actual notice of a permanent

injunction against further defective controls nevertheless permitted KBR to again suffer from the related deficiency of internal controls over financial disclosure.  In light of the SEC's permanent injunction, the failure of defendants Blount, Carroll, Curtiss, Lyles, and Slater ensure KBR's internal controls were adequate could not have been in good faith, particularly with their knowledge of the cost estimate problems in 2012 and 2013.  These defendants were specifically and directly admonished by the SEC not to be involved in any further bad accounting in violation of GAAP or deficient control situations, and yet they were again a few short years later in a circumstance in which any observer could tell the Company's cost estimation procedures were unreliable.  The Company has now been seriously harmed.  As a result, defendants Blount, Carroll, Curtiss, Lyles, and Slater face an even higher likelihood of liability for their wrongdoing detailed herein.

104.    As particularized herein, to properly prosecute this lawsuit, the Director Defendants would have to sue themselves and the other defendants, requiring them to expose themselves and their comrades to tens of millions of dollars in civil liability and/or sanctions. This, they have refused to do thus far, and will not do in the future.  A majority of the Director Defendants are exposed to potential liability for breaching their fiduciary duties by consciously or recklessly declining to institute functioning internal controls even though they knew or were reckless in not knowing that the Company's internal controls were seriously deficient and accounting chicanery was rampant.  Thus, demand on the Director Defendants is futile.

## COUNT I
## BREACH OF FIDUCIARY DUTY

105.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

106.    Each defendant owes and owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of KBR's business and affairs, particularly with respect to maintaining compliance with applicable laws and regulations in core areas of the Company's business, as well as controls over disclosure.

107.    Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company.  Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of KBR.

108.    In breach of their fiduciary duties owed to KBR, defendants willfully participated in and caused the Company to expend unnecessarily its corporate funds, and failed to act in good faith in their roles overseeing KBR's business, rendering them personally liable to the Company for breaching their fiduciary duties.

109.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, KBR has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

## COUNT II
## ABUSE OF CONTROL

110.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

111.    Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence KBR, for which they are legally responsible.

112.    As a direct and proximate result of defendants' abuse of control, KBR has sustained significant damages.

113.    As a direct and proximate result of defendants' breaches of their fiduciary obligations, KBR has sustained and continues to sustain significant damages.  As a result of the misconduct alleged herein, defendants are liable to the Company.

114.    By reason of the foregoing, KBR has been damaged.

## COUNT III
## AGAINST THE DEFENDANTS FOR VIOLATIONS OF SECTION 14 OF THE SECURITIES EXCHANGE ACT OF 1934

115.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

116.    Rule 14a-9, promulgated pursuant to § 14(a) of the Securities Exchange Act of 1934, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14a-9.  The Company's proxy statement filed April 1, 2014, violated § 14(a) and Rule 14a-9 because it included by reference materially false and misleading financial statements.

117.    The proxy statement was false and misleading when issued because although the Company had disclosed material weaknesses to its internal controls in February 2014, KBR's public statements had assured investors that the problem was isolated and that the Company's 2013 reported financial results were accurate and in compliance with GAAP.  However, on May 5, 2014, over a month after the proxy statement was filed, the Company disclosed that, in fact, the 2013 results were not accurate, were not in compliance with GAAP, and would need to be restated.  As a result, KBR's 2014 proxy statement solicited, and, upon information and belief, obtained, stockholders votes based on misleading information.

118.    In the exercise of reasonable care, defendants should have known that the statements contained in the proxy statement were materially false and misleading.

119.    The misrepresentations and omissions in the proxy statement were material to

Company stockholders in voting on the proxy statement because the Company's ability to account for its core business seriously compromised and defendant Utt and other named officers were receiving millions of dollars in incentive based compensation due to falsely inflated financial results.  Moreover, the Director Defendants who solicited votes on their own behalf were, by their own admission, responsible for oversight and approval of major contracts.  It was material to stockholders that these defendants were not performing the duties that they admitted they were required to perform.

120.    The proxy statement was an essential causal link in the harm to KBR.  Because of the reelection of the Director Defendants who were breaching their fiduciary duties and concealing KBR's accounting problems, KBR now faces likely liability in the Securities Class Action and is subject to an SEC investigation.  Further, KBR was harmed because it paid approximately $4.6 million in incentive compensation to defendant Utt, and approximately $14.9 million in incentive compensation to other executive officers, during 2013 based on falsely inflated financial results. The Director Defendants, complicit in the concealment of wrongdoing, did not seek to clawback those funds even though they had the power to do so.

121.    The Company was damaged as a result of the defendants' material misrepresentations and omissions in the proxy statement.

## COUNT IV
## AGAINST DEFENDANTS UTT FOR UNJUST ENRICHMENT

122.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

123.    By his receipt of over $4.5 million in profits due to the sale of KBR stock at a time when he was in possession of material, undisclosed information, namely that defendant Baldwin had resigned, defendant Utt was unjustly enriched at the expense of, and to the

detriment of, KBR.

124.    Plaintiff seeks restitution from defendant Utt, on behalf of KBR, and seeks an order of this Court disgorging all profits and benefits obtained by defendant Utt as a result of his wrongful conduct and breaches of fiduciary duties

## PRAYER FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all defendants as follows:

A.    Declaring that Plaintiff may maintain this action on behalf of KBR and that Plaintiff is an adequate representative of the Company;

B.    Declaring that the Director Defendants have breached their fiduciary duties to KBR;

C.    Declaring that the Director Defendants have violated §14(a) of the Securities Exchange Act of 1934 and Rule 14a-9;

C.    Determining and awarding to KBR the damages sustained by it as a result of the violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.    Directing KBR and the Director Defendants to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect KBR and its stockholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for stockholder vote the following resolutions for amendments to the Company's By-Laws or Articles of Incorporation; and the following actions as may be necessary to ensure proper Corporate Governance Policies:

      1.      a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater stockholders input into the policies and guidelines of the Board;

      2.      a provision to permit the stockholders of KBR to nominate at least three candidates for election to the Board;

      3.      a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations;

E.      Determining and awarding to KBR exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

F.      Awarding KBR restitution from defendants, and each of them;

G.      Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

H.      Granting such other and further equitable relief as this Court may deem just and proper.

## <u>JURY DEMAND</u>

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury.

Dated: June 23, 2016

By: */s/ Brian D. Long*             
Brian D. Long (#4347)
**RIGRODSKY & LONG, P.A.**
2 Righter Parkway, Suite 120
Wilmington, DE 19803
Telephone: (302) 295-5310
Facsimile: (302) 654-7530
bdl@rl-legal.com

Robert I. Harwood
Matthew M. Houston
Benjamin I. Sachs-Michaels
**HARWOOD FEFFER LLP**
488 Madison Avenue
New York, NY 10022
Telephone: (212) 935-7400
Facsimile: (212) 753-3630

*Attorneys for Plaintiff*