# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| PAVEL BUTORIN, Derivatively on Behalf of Nominal Defendant KBR, INC., | : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | :     C.A. No. 15-283-LPS <br> : |
| W. FRANK BLOUNT, LOREN K. CARROLL, JEFFREY E. CURTISS, LINDA Z. COOK, LESTER L. LYLES, JACK B. MOORE, RICHARD J. SLATER, JOHN R. HUFF, and WILLIAM P. UTT, | : <br> : <br> : <br> : <br> : <br> : |
| Defendants, | : <br> : |
| and | : <br> : |
| KBR, INC., | : <br> : |
| Nominal Defendant | : |

Brian D. Long, RIGRODSKY & LONG, P.A., Wilmington, DE

Robert I. Harwood, Matthew M. Houston, James G. Flynn, Benjamin I. Sachs-Michaels, HARWOOD FEFFER LLP, New York, NY

    Attorneys for Plaintiffs


Kelly E. Farnan, RICHARDS LAYTON &FINGER, P.A., Wilmington, DE

Michael C. Holmes, Jeffrey S. Johnston, Amy E. Tankersley, VINSON &ELKINS LLP, Dallas, TX

    Attorneys for Defendants

## **MEMORANDUM OPINION**

September 30, 2018
Wilmington, Delaware

*[signature: Leonard P. Stark]*

**STARK, U.S. District Judge:**

Plaintiff Pavel Butorin ("Plaintiff" or "Butorin"), who owns shares of stock in Nominal Defendant KBR, Inc. ("KBR" or the "Company"), filed this derivative action against KBR and Defendants W. Frank Blount, Loren K. Carroll, Jeffrey E. Curtiss, Linda Z. Cook, Lester L. Lyles, Jack B. Moore, Richard J. Slater, John R. Huff, and William P. Utt (collectively, the "Director Defendants" and, together with KBR, "Defendants"). (D.I. 28) ("Complaint" or "Compl.") Butorin seeks to press breach of fiduciary duty claims against the Director Defendants on behalf of the Nominal Defendant.[1] The case was stayed, by agreement of the parties, during the pendency of a motion to dismiss in a related securities fraud class action (the "Securities Lawsuit") in the United States District Court for the Southern District of Texas. (*See* D.I 26)

Pending before the Court is Defendants motion to dismiss pursuant to Federal Rules of Civil Procedure 23.1 and 12(b)(6). (D.I. 30) The Court will grant the motion.

---

[1] The operative Second Amended Complaint also alleges claims for abuse of control, violation of Section 14 of the Securities Exchange Act of 1934, and unjust enrichment. (D.I. 28 ¶¶ 110-24) However, in response to the motion to dismiss all claims, Plaintiff responded in its briefing only with respect to the fiduciary duty claim, thereby abandoning its other claims. (*See* D.I. 35 at 2; *see also Baldonado v. Avrinmeritor, Inc.*, 2014 WL 2116112, at *7 (D. Del. May 20, 2014))

In his brief, Plaintiff also appears to be attempting to amend his operative complaint, by adding a new claim for breach of the duty of loyalty. (*See* D.I. 35 at 1-2) (Defendants' making this argument) This is improper. *See Hughes v. United Parcel Serv., Inc.*, 639 Fed. App'x 99, 104 (3d Cir. 2016) ("[I]t is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss.") (internal citation omitted). Consequently, in analyzing the pending motion, the Court is considering only the breach of fiduciary duty of care claim contained in the Second Amended Complaint.

1

**I.  BACKGROUND**

This lawsuit arises out of "seven construction contracts related to pipe fabrication and modular assembly projects" to which KBR was a party in Canada (the "Canadian Contracts"). (Compl. ¶ 33) (internal quotation marks omitted)  The Complaint alleges that these projects were of high importance to KBR, as reflected in the fact that losses incurred from the misreporting of these projects cost KBR more than the Company made in net income in either 2012 or 2013.  (*Id.* ¶ 34)  The Complaint alleges that in KBR's 2012 Form 10-K, the Company disclosed that "at least quarterly, significant projects are reviewed in detail by senior management."  (*Id.* ¶ 36) (internal brackets and quotation marks omitted)  It further alleges "[t]he Board also engages in risk oversight through the project approval process, whereby projects reaching a threshold level of expected revenues require Board approval."  (*Id.*)  Plaintiff, however, does not identify that threshold or how the Canadian Contracts compare to it.  The Complaint does allege that the Board permitted KBR representatives to state that the Canadian Contracts "were a core element of KBR's financial performance and highly profitable" and to "issue disclosures hyping the strong performance of the Canadian pipe fabrication business."  (*Id.* ¶ 38)

Plaintiff also alleges that prior to approval of a large project, KBR's senior management would receive white-paper briefs, which "would include cost estimates, an explanation of how they were created, [and] risk evaluation, and they specifically would note the presence or absence of '*design drawings*.'"  (*Id.* ¶ 37) (emphasis added)[2]  Incorporating allegations from the Securities Lawsuit, Plaintiff adds that Company policy is to view "entering a new construction contract without design drawings . . . as a significant risk and required the approval of senior

---

[2] Defendants assert that the Court cannot rely on this allegation, since it is solely based on an undisclosed confidential witness in the Securities Lawsuit.  (*See* D.I. 35 at 4-5)  The Court need not decide this issue, for reasons explained below.

management." (*Id.*) (citing *Kohut, et al., v. KBR, Inc., et al.,* Case No. 4:14-cv-01287 (S.D. Tex.) (ECF No. 60 at ¶ 62))

In 2013, KBR filed its form 10-K with the Securities and Exchange Commission ("SEC") for the 2012 fiscal year, disclosing a decrease in consolidated operating income due to "increased estimated costs to complete several U.S. construction fixed-price projects." (*Id.* ¶ 39) The 2012 10-K also disclosed that revenue from KBR's "Services" business increased overall compared to the prior year, largely due to the Canadian Contracts. (*Id.*) The 10-K described KBR's accounting policies, which include a percentage-of-completion methodology,[3] whereby significant projects are reviewed quarterly in detail by senior management. (*Id.* ¶ 40) The Complaint specifies the risk management role of the Board, the role of the Board's Audit Committee,[4] and which directors were on the Audit Committee.

On April 12, 2013, KBR supplemented its SEC disclosures and, on April 25 of that year, issued a press release describing increases in revenue and discussing the Canadian Contracts. (*Id.* ¶¶ 44-45) Relying in part on these representations regarding the Canadian Contracts, "various analysts published reports projecting strong growth for KBR." (*Id.* ¶ 47) Other SEC filings and statements of KBR corporate officers mentioned the importance of the Canadian Contracts and their relation to the success of the Company. (*See id.* ¶¶ 48-51) Defendant Utt

---

[3] "Under this method of accounting, the recordable revenue is derived by multiplying the percentage of completion of the project by the total estimated gross profit for the contract and adding that number to the costs incurred. The percentage that is then used in that calculation is derived by comparing the actual costs incurred to date to the total forecasted costs for the contract." (D.I. 31 at 4-5)

[4] "The Audit Committee is charged with reviewing with management the company's major financial risk exposures, as well as other areas of risk exposure if requested to do so by the Board, and the steps management has taken to monitor and mitigate those exposures." (Compl. ¶ 42)

stated on November 13, 2013 "that the Company's operations in Canada have been very successful in construction fabrication turnarounds." (*Id.* ¶ 55) (internal quotation marks omitted) Shortly thereafter, on December 16, KBR announced that Defendant Utt would be retiring as Chairman, President, and CEO. (*Id.* ¶ 56)

KBR's 2013 Form 10-K, filed on February 27, 2014, "concluded there was a material weakness in the operating effectiveness of its internal control over financial reporting," adding that after additional analysis "the consolidated financial statements included in this Form 10-K present fairly, in all material respects, our financial position." (*Id.* ¶ 58) The same 10-K touted the Canadian Contracts (i.e., "oil sands-related projects in western Canada"). (*Id.* ¶ 59)

KBR's Chief Accounting Officer resigned on March 4, 2014, which the Company publicly disclosed on March 10. (*Id.* ¶ 61) Meanwhile, on March 6, Defendant Utt sold $4.5 million worth of KBR stock. (*Id.* ¶ 62) On April 1, the Board filed with the SEC its definitive proxy statement for a May 15 shareholder meeting, at which stockholders would vote on matters including election of directors. (*Id.* ¶ 64) The proxy statement disclosed that each of the incumbent directors attended 75% or more of the aggregate meetings and repeated information about the Board's risk oversight functions. (*Id.* ¶¶ 65-66)

"On April 9, 2014, the Board caused the Company to announce that [D]efendant Utt had resigned and Stuart Bradie ('Bradie') had been named President and Chief Executive Officer of KBR, effective June 2, 2014." (*Id.* ¶ 67) "On May 5, 2014, the Board caused KBR to issue a press release announcing that it would restate its financial statements for the year 2013." (*Id.* ¶ 68) The restatement involved recognition of $158 million of losses associated with the Canadian Contracts. (*Id.* ¶ 68) The loss triggered a default in certain credit covenants and

caused analysts to downgrade KBR stock from Buy to Neutral and to lower the stock price target by 20%. (*Id.* ¶¶ 68-70)

The SEC opened an investigation into the "material weaknesses to KBR's internal controls and the restatement." (*Id.* ¶ 72) In response, the Board put forward a plan to remediate oversight weaknesses, but then, on June 19, KBR reported further losses during the first quarter of 2014 stemming from the same Canadian Contracts. (*Id.* ¶¶ 75-79) On a call with investors and analysts, KBR's Chief Financial Officer and Executive Vice President blamed the unexpected losses on the lack of in-house drawings earlier in the process. (*Id.* ¶¶ 79-80)[5]

Plaintiff instituted this derivative suit without first making a demand on the Board, based on his view that "a pre-suit demand on the KBR Board would be futile, and therefore, [is] excused." (*Id.* ¶¶ 85-86) This alleged futility stems from Defendants' (1) bad faith concealment of their inability to "accurately estimate the costs of major contracts," (2) failure "to institute functioning internal controls," and (3) decision to allow "the Company to issue misleading and untruthful disclosures." (*Id.* ¶ 86) Plaintiff alleges that these errors expose the Director

---

[5] His full comments were as follows:

> On the remaining contracts, the majority of the drawings have now been received from the clients and therefore, we're able to do the take offs to understand exactly what the scope of work is. So when the quantity of work increases based upon drawings, that's what's driving the results for this quarter. ***So it was really impossible for anyone to be able to predict what the scope of work will be when you don't have the drawings*** that are issued for construction in-house. So as we get to the back-end of these projects, the drawings are in and now we have defined the scope and therefore we're much better suited to be able to estimate what those costs are to complete.

(*Id.* at ¶ 80) (emphasis added)

5

Defendants to "a substantial risk of liability for breaches of good faith and loyalty, rendering them unable to fairly and objectively evaluate a pre-suit demand." (*Id.*)

As part of their motion to dismiss, Defendants point to KBR's Certificate of Incorporation, which, they contend, "precludes KBR's directors from being monetarily liable to the [C]ompany or its shareholders for breach of fiduciary duty, except in cases where directors breach their duty of loyalty, act in bad faith, [or] engage in intentional misconduct." (D.I. 31 at 6) (citing exculpatory provision in KBR's Certificate of Incorporation, as permitted by Section 102(b)(7) of Delaware General Corporation Law)

## II. LEGAL STANDARDS

### A. Rule 23.1

Federal Rule of Civil Procedure 23.1 applies "when one or more shareholders or members of a corporation or an unincorporated association bring a derivative action to enforce a right that the corporation or association may properly assert but has failed to enforce." Fed. R. Civ. P. 23.1(a). The derivative action may only be maintained if the plaintiff "fairly and adequately represent[s] the interests of shareholders or members who are similarly situated in enforcing the right of the corporation or association." *Id.* In order to maintain such a derivative suit, the plaintiff must have owned shares in the company at the time of the disputed transaction. *See* Fed. R. Civ. P. 23.1(b)(1).

In addition, a derivative complaint must "state with particularity" "(A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort." Fed. R. Civ. P. 23.1(b)(3).

Put another way, Rule 23.1 requires that a shareholder plaintiff make a pre-suit demand on the board of directors prior to filing a derivative suit on behalf of the company, or to provide a satisfactory explanation for why the plaintiff has not done so. This demand requirement allows the corporate machinery to self-correct problems and helps safeguard against frivolous lawsuits. *See Ryan v. Gifford*, 918 A.2d 341, 352 (Del. Ch. 2007).

"Although Rule 23.1 provides the pleading standard for derivative actions in federal court, the substantive rules for determining whether a plaintiff has satisfied that standard are a matter of state law." *King v. Baldino*, 409 Fed. Appx. 535, 537 (3d Cir. 2010) (internal quotation marks omitted). KBR is a Delaware corporation (*see, e.g.*, Compl. ¶ 18) and, therefore, Delaware law governs the demand futility or refusal analysis. *See generally Kamen v. Kemper Fin. Servs.*, 500 U.S. 90, 101-05 (1991).

In order to excuse the demand requirement, a derivative complaint must allege particularized facts sufficient to cast "reasonable doubt" over: (1) the directors' disinterestedness and independence; or (2) the directors' "valid exercise of [their] business judgment." *Aronson v. Lewis*, 473 A.2d 805, 814-15 (Del. 1984); *see also Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000). If either prong is satisfied, the demand requirement is excused. *See Brehm*, 746 A.2d at 256; *see also In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d 165, 170 (D. Del. 2009).

Where the dispute involves a violation of the Board's oversight duties, courts will apply the test described by the Delaware Supreme Court in *Rales v. Blasband*, 634 A.2d 927, 934 (Del. 1993). Accordingly, Plaintiff must allege particularized facts establishing a reason to doubt that "'the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand.'" *Wood v. Baum*, 953 A.2d 136, 140 (Del. 2008) (citing *Rales*)

7

### B. Rule 12(b)(6) Motion to Dismiss

Evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) requires the Court to accept as true all material allegations of the complaint. *See Spruill v. Gillis*, 372 F.3d 218, 223 (3d Cir. 2004). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1420 (3d Cir. 1997) (internal quotation marks omitted). Thus, the Court may grant such a motion to dismiss only if, after "accepting all well-pleaded allegations in the complaint as true, and viewing them in the light most favorable to plaintiff, plaintiff is not entitled to relief." *Maio v. Aetna, Inc.*, 221 F.3d 472, 481-82 (3d Cir. 2000) (internal quotation marks omitted).

A well-pleaded complaint must contain more than mere labels and conclusions. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). A plaintiff must plead facts sufficient to show that a claim has substantive plausibility. *See Johnson v. City of Shelby*, 135 S. Ct. 346, 347 (2014). A complaint may not be dismissed, however, for imperfect statements of the legal theory supporting the claim asserted. *See id.* at 346.

"To survive a motion to dismiss, a civil plaintiff must allege facts that 'raise a right to relief above the speculative level on the assumption that the allegations in the complaint are true (even if doubtful in fact).'" *Victaulic Co. v. Tieman*, 499 F.3d 227, 234 (3d Cir. 2007) (quoting *Twombly*, 550 U.S. at 555). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. At bottom, "[t]he complaint must state enough facts to raise a reasonable expectation that discovery will reveal evidence of [each] necessary

element" of a plaintiff's claim. *Wilkerson v. New Media Tech. Charter Sch. Inc.*, 522 F.3d 315, 321 (3d Cir. 2008) (internal quotation marks omitted).

The Court is not obligated to accept as true "bald assertions," *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997) (internal quotation marks omitted), "unsupported conclusions and unwarranted inferences," *Schuylkill Energy Res., Inc. v. Pa. Power & Light Co.*, 113 F.3d 405, 417 (3d Cir. 1997), or allegations that are "self-evidently false," *Nami v. Fauver*, 82 F.3d 63, 69 (3d Cir. 1996).

## III. DISCUSSION

### A. The Complaint Fails To Demonstrate That Demand Was Excused

Plaintiff did not make a pre-suit demand on the Board. Consequently, his derivative Complaint must be dismissed unless Plaintiff can establish that demand should be excused. To excuse demand, Plaintiff must allege "particularized facts establishing a reason to doubt that the board of directors could have properly exercised its independent and disinterested business judgment in responding to a demand." *Wood*, 953 A.2d at 140 (internal quotation marks omitted). Delaware law presumes that a corporation's board of directors is disinterested and independent. *See FLI Deep Marine LLC v. McKim*, 2009 WL 1204363, at *3 (Del. Ch. Apr. 21, 2009). To rebut that presumption under the first prong of *Aronson*, Plaintiff must undertake a "director-by-director analysis" showing that a majority of the Board was incapable, due either to a material personal interest or domination and control, of objectively evaluating a demand, if made. *See Postorivo v. AG Paintball Holdings*, 2008 WL 553205, at *7 (Del. Ch. Feb. 29, 2008).

Plaintiff contends that here, demand would have been futile because a majority of the Board faced potential liability. (Compl. ¶ 86) Plaintiff has failed to show that he is correct and, hence, his Complaint will be dismissed.[6]

Plaintiff's contention fails, first, because he has failed to plead particularized facts to show "a substantial likelihood" that each of the Directors could be personally liable for the alleged wrongful acts. *Rales*, 634 A.2d at 936. The substance of Plaintiff's claim is that the Board failed to exercise proper oversight of KBR – what is referred to as a "*Caremark* claim" and has been described as "possibly the most difficult theory in corporation law upon which a plaintiff might hope to win a judgment." *In re Caremark Int'l Derivative Litig.*, 698 A.2d 959, 967 (Del. Ch. 1996). To prevail on this claim, Plaintiff must allege particularized facts showing either: (1) "the directors utterly failed to implement any reporting or information system or controls;" or (2) "having implemented such a system or controls, [the directors] consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention." *Stone v. Ritter*, 911 A.2d 362, 370 (Del. 2006). Plaintiff only purports to satisfy the second of these two possibilities, so the issue becomes whether Plaintiff has adequately "plead[] with particularity that there were so-called 'red flags' that put the directors on notice of problems with their systems, but which were ***consciously*** disregarded." *In re Gen. Motors Co. Derivative Litig.*, 2015 WL 3958724, at *16 (Del. Ch. June 26, 2015) (emphasis added). Plaintiff has failed to do so.

---

[6] Plaintiff did not plead facts specific to each director; the Complaint does not deal with each director on an individual basis. *See Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) (requiring pleading of "facts specific to each director"); *see also In re Citigroup, Inc. Shareholder Derivative Litig.*, 964 A.2d 106, 121 n.36 (Del. Ch. 2009) (explaining "'group' accusation mode of pleading demand futility" is insufficient). This is a deficiency in the Complaint and a basis on which it may be dismissed.

Plaintiff describes the red flags it has alleged as being: "reduced income precisely due to over-stated costs (¶¶ 89(d), 95(d)), SEC specific inquiries about (and the Company's response thereto) disclosures about KBR's estimation of contract costs (¶¶ 89(e)-(f)), recent disclosures of $21 million in charges due to contract cost estimates (¶¶ 89(i), 95(i)), the February 2014 announcement about KBR's material weaknesses in financial reporting (¶¶ 89(j), 95(j)), and recent disclosures of $62 million in charges related to contract cost underestimation (¶¶ 89(k), 95(k))." (D.I. 34 at 22) (citing Complaint) Plaintiff overstates what is alleged in his Complaint. Instead, taking as true all the ***well-pled factual allegations*** actually contained in the Complaint, the Court concludes that Plaintiff has failed to adequately plead particularized facts to render plausible that the Director Defendants faced a substantial likelihood of liability. Few, if any, "red flags" are adequately alleged.

While Plaintiff emphasizes the failures with cost estimates and resulting restatements in SEC disclosures and inquiries from the SEC, the materials in the record make plain that KBR all along disclosed its accounting method and the risks attendant to it. For example, KBR's public filings repeatedly advised shareholders, in bold and italicized language, that the Company's ***"use of the percentage-of-completion method of revenue recognition could result in a reduction or reversal of previously recorded revenues and profits."*** (D.I. 32-1) (2013 10-K at 16) Much of what Plaintiff alleges, therefore, could not have constituted "red flags" but, instead, were well within the realm of risks the Company, Defendants, and shareholders understood could materially affect the Company's financial results.

Moreover, Plaintiff has failed to adequately allege that the Board approved the Canadian Contracts. The Complaint merely alleges that "senior management" – not all of the Defendant Directors – reviewed significant projects at least quarterly. (Compl. ¶ 36) ("The Board also

engages in risk oversight through the project approval process, whereby projects reaching a threshold level of expected revenues require Board approval. . . . In reviewing projects, the Board is presented with management's assessment of a particular project's cost exposure associated with operations risk, liabilities and funding risks, among others.") This is insufficient. *See Taylor v. Kissner*, 893 F. Supp. 2d 659, 671 (D. Del. 2012) ("Under Delaware Law, there is no authority to support the attribution of knowledge to Outside Directors who are not alleged to be directly involved in the day-to-day operations of the company.") (internal citations omitted). The Complaint broadly – and without particularity – alleges that contracts above an unspecified, unidentified threshold require Board approval, and speculates – again without any particularized factual allegations – that the Canadian Contracts must have exceeded that threshold. (*See* Compl. ¶ 36) (alleging Board "engage[d] in risk oversight through the project approval process, whereby projects reaching a threshold level of expected revenues require Board approval") Such speculation is insufficient to create a substantial likelihood that individual directors would be liable and, therefore, excuse demand.

KBR notes in its briefing that its 2013 restated revenue was $7.2 billion – an amount that dwarfs the amounts involved with the Canadian Contracts. (D.I. 31 at 14) Neither in its Complaint nor its briefing does Plaintiff challenge the accuracy of this figure, the propriety of the Court relying on it, or how Plaintiff's allegations as to the materiality of the Canadian Contracts are plausible and particularized in light of the size of KBR as a Company.

There are also no well-pled, particularized factual allegations that the Board knew the Canadian Contracts lacked design drawings and that this meant KBR could not reliably estimate the costs that would be associated with completion of the Canadian Contracts projects. (*See* D.I. 31 at 13) Even assuming that it is appropriate to consider allegations made by a confidential

12

witness in the Securities Lawsuit (*but see* D.I. 35 at 4-5) – a witness whose identity evidently is not known to Plaintiff's counsel – that witness appears to have alleged only that KBR's *senior management*, and *not* the Board, knew of the lack of in-house drawings and consciously disregarded the associated risks. (*See* Compl. ¶ 37) Only one of the Director Defendants, Utt, was also a member of senior management, so Plaintiff has failed to allege particularized facts sufficient to show that issues relating to the drawings create a substantial likelihood of personal liability for "the Board" such as to excuse demand.

Plaintiff argues that because four directors, constituting a majority of the Board, were on the Audit Committee at the time of approval of the Canadian Contracts, the knowledge of the Audit Committee should be attributed to the entire Board. (*See* D.I. 34 at 17) (citing *Ryan*, 918 A.2d at 353) This contention fails to advance Plaintiff's position. *Ryan*, the case on which Plaintiff relies, involved particularized facts that an audit committee approved the improper transactions whereas, here, Plaintiff has not specifically pled that even the Audit Committee approved the transactions; the Complaint merely references certain documents showing enhanced oversight responsibilities of the Audit Committee. (*See, e.g.*, Compl. ¶ 42)

Additionally, as Defendants persuasively argue, "Plaintiff has not adequately pled what the Board's approval of the [Canadian] Contracts would have revealed to the Board about how KBR's systems were operating ineffectively, or what, if anything, the Board failed to do in approving the [Canadian] Contracts that showed a conscious disregard for any problems with KBR's internal systems." (D.I. 31 at 22) Instead, as Defendants further argue, "Plaintiff attempts to equate KBR's restatement with a failure-of-oversight by the Board, but his allegations are too speculative and far-fetched to survive the requirements of Rule 23.1 or [as the

13

Court will briefly note below] Rule 12(b)(6)." (D.I. 31 at 1) Accordingly, Defendants' motion to dismiss will be granted.

### B. The Complaint Fails To State A Claim On Which Relief May Be Granted

For the same reasons already given regarding demand futility, Plaintiff has also failed to state a plausible claim for breach of fiduciary duty, so Plaintiff's claim must be dismissed under Rule 12(b)(6). Plaintiff has not alleged sufficient "red flags" to have put the Director Defendants on notice of problems with KBR's oversight systems which they consciously disregarded. Accordingly, Plaintiff has failed to adequately allege a *Caremark* failure-of-oversight claim, so – even were demand excused (which it is not) – Plaintiff's Complaint must be dismissed.

### IV. CONCLUSION

For the reasons stated above, the Court will grant Defendants' motion to dismiss. An appropriate Order will be entered.